STATE OF MARYLAND *v.* ROLL AND SCHOLL

[No. 123, September Term, 1972.]

*Decided January 17, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edward F. Borgerding, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Jeffrey Russell Werner, Assistant State's Attorney for Montgomery County,* on the brief, for appellant.

*Gary Howard Simpson,* with whom was *Raymond W. Russell* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

When our forefathers "ordained and established" the Constitution of the United States, one of their specified purposes was "to establish justice." Toward this end, a separate judicial branch was created as a co-equal with the other branches of government. Throughout the history of this country, the courts have been charged with the solemn responsibility of safeguarding the rights of our citizens. There have been few other times in our history when this task has been made so difficult. Today, with the recent breakdown of law and order and the distrust of government being so great, it is not surprising that divisive and disruptive activities have entered

into the courts. Such disrespectful conduct has no place in the halls of justice.

As Mr. Justice Harlan stated for the Supreme Court in *Boddie v. Connecticut*, 401 U. S. 371, 374, 28 L.Ed.2d 113, 91 S. Ct. 780 (1971):

> "Perhaps no characteristic of an organized and cohesive society is more fundamental than its erection and enforcement of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitively settle their differences in an orderly, predictable manner. Without such a 'legal system,' social organization and cohesion are virtually impossible; with the ability to seek regularized resolution of conflicts individuals are capable of interdependent action that enables them to strive for achievements without the anxieties that would beset them in a disorganized society. Put more succinctly, it is this injection of the rule of law that allows society to reap the benefits of rejecting what political theorists call the 'state of nature.' "

Being manned by mortals, however, our judicial system is not perfect; but the efforts to improve should not be impeded by abusive, contemptuous behavior designed to bully, insult, ignore, frustrate and paralyze the judicial process. Such deeds are at war with our concept of justice under the law and must be eliminated.

One weapon in the court's arsenal useful in defending its dignity is the power to punish for contempt. But the magnitude of its force demands care and discretion in its use so as to avoid arbitrary, capricious or oppressive application of this power. The contempt power has stood as a sentry at the citadel of justice for a very long time and it is probably because of this antiquity that its modern day application is sometimes misunderstood and

often confused.[1] This appeal presents us with an opportunity to allay that misunderstanding and confusion.

The two cases now before us[2] began in the Circuit Court for Montgomery County where Judge Walter H. Moorman found Daniel T. Roll and William E. Scholl, appellees here, in direct contempt of court for refusing to testify before the October term, 1971 grand jury.[3] The appellees were summoned to appear before that body on October 20, 1971 to testify in a matter being investigated by the grand jury, State v. Michael L. Ingram, Helen Marie Ingram and Thomas Robert Yendell. The grand jury hoped to obtain testimony from these witnesses regarding their knowledge of possible violations of the Code of Maryland (1957, 1971 Repl. Vol.), Art. 27, §§ 276-302 ("Health-Controlled Dangerous Substances"). Section 298 (c) of that act provides that:

> "(c) *Witnesses' immunity.*—No person shall, upon pain of contempt of court, refuse to testify concerning any violations of the provisions of this subheading because his testimony might tend to incriminate him or implicate him in such violations and every such person shall be a competent witness and compellable to testify against any person who may have committed any of the offenses set forth under this subheading, provided that any person so compelled to testify on behalf of the State in any such case shall be exempt from prosecution, trial and punishment for any and all such crimes and offenses about which such person was so compelled to testify." [4]

---

1. *See R. Goldfarb, The Contempt Power,* (1963); Dobbs, *Contempt of Court: A Survey,* 56 *Cornell L. Rev.* 183 (1971).

2. Though separate cases, we shall treat these two appeals here on writ of certiorari in one opinion as did the Court of Special Appeals.

3. In Montgomery County, under the local rules, Rule 3a provides for two terms of court, the first beginning on the first Monday of March of each year and the second on the first Monday of October. The terms of the grand jury for that county coincide with the court terms. Therefore, the term of the grand jury appellees were summoned to testify before expired on March 6, 1972.

4. The Court of Special Appeals, in its opinion in these cases,

Roll appeared before the grand jury on October 20, 1971 in compliance with the summons served upon him. The transcript of the proceedings before the grand jury discloses that Roll gave his name, said he was not represented by counsel and that he had not consulted an attorney. The Assistant State's Attorney, Jeffrey R. Werner, then asked if Roll was aware of the reason for which he was summoned. Roll answered affirmatively and asked to be permitted to make a statement. Before the statement was permitted, the Assistant State's Attorney attempted to clarify what he proposed to do. He informed Roll that he was going to be questioned about the sale of controlled dangerous substances at 1714 Dublin Street in Silver Spring during the period of December 1970 to April 1971; and Roll was advised that any answers that might implicate him would not result in prosecution as he would be granted immunity. Roll responded by making the following statement:

"First I'd like to state that I am without legal representation. Number two, as a resident of the regional district I resent being called to this hearing because for many reasons it puts me in a precarious position with my participation in the program which I participate in and my situation with the rest of the people whom I associate with on the street.

Roll and Scholl v. State, 15 Md. App. 31, 34-35, 288 A. 2d 605 (1972), described the tripartite function of this statute as:
"First, it makes a refusal, on the ground of self-incrimination, to testify concerning any violations of the law relating to controlled dangerous substances a contempt of court. Second, it makes a person called to testify concerning such violations a competent and compellable witness. Third, it obviates constitutional objection to its provisions by supplanting the constitutional privilege against compulsory self-incrimination with a grant of immunity from prosecution, trial and punishment."
We note that this statute, with its grant of immunity, is merely declaratory of what may already be considered to be a contemptuous act under the inherent powers of the court. Cf. Hitzelberger v. State, 173 Md. 435, 196 A. 288 (1938); Kelly v. Montebello Park Co., 141 Md. 194, 118 A. 600 (1922). It does not classify the contempt as civil or criminal, direct or constructive.

This places my program in precarious position, having myself testify in this manner which they do not approve of, in court. This puts me in the position of physical danger from my peers upon this, whatever evidence I may give, if this is used in court there is true physical danger; number two, the stigma that would be attached to me, more importantly to the program of RAP, Incorporated,[5] itself, in the eyes of heroin addicts in Montgomery County, of whom there are quite a few; would tend to draw them away from our program instead of encouraging their participation in it, which is something I don't want to see happen, and the Program doesn't want to see it happen.

And in light of these things I would like to be disqualified as a witness."

Roll's request to be "disqualified as a witness" was denied by the Assistant State's Attorney and he was again told about the statutory grant of immunity and was requested to answer certain questions. The witness remained steadfast and refused to respond to Werner's inquiries even though Roll knew such behavior would subject him to contempt of court proceedings and, as he said, possible imprisonment "up to and including March 1, 1972."

Faced with this adamant refusal, Werner promptly submitted a "Petition for Direct Contempt" to the court and sought to have Roll punished for "direct contempt of court for his refusal to testify before the Grand Jury of Montgomery County after being duly served notice in the matter of State v. Ingram, Ingram and Yendell, on October 20, 1971." The petition alleged that this witness had been duly served with notice that his testimony was required, that he appeared and was sworn to testify

---

5. These initials are an abbreviation for Regional Addiction Prevention, Inc., a non-profit organization dedicated to the reeducation of drug users.

but he refused despite being informed of his immunity from prosecution, trial and punishment under Code, Art. 27, § 298 (c). The petition requested the court to order Roll to show cause why he should not be held in "direct contempt."

On the afternoon of October 20, 1971, the same day Roll was to testify before the grand jury, he was brought before Judge Moorman to answer the show cause order. Because of the sensitive nature of the proceedings the courtroom was cleared of everyone except, as suggested by the Assistant State's Attorney, "the court and the stenographer and the clerk and the forelady [of the grand jury] and myself and the defendant [Roll]." [6] Apparently this suggestion was accepted and the court proceeded to hear testimony. The State attempted to establish its case by first calling Jane Keys, the forelady of the grand jury. She stated that Roll was before that body to testify concerning a presentment or indictment then under consideration and there were no charges pending against him. She further stated that while Roll appeared before the grand jury and was advised that he would be granted immunity concerning his testimony; nevertheless, he refused to answer any questions. When Roll indicated he had no questions of this witness, Johanna Wissenbach, clerk to the grand jury for the October 1971 term, was called. She read the transcript of the proceedings taking place before that body involving Roll which disclosed what we have already outlined. This ended the State's case.

Roll was then asked by the court if he wished "to take the stand to show any reason why [he] should not be held in contempt of the court for failing to testify before the grand jury after [he was] promised immunity." Roll did so and after being sworn, the transcript reads:

"THE COURT: You may make whatever statement you would like to make to the Court.

6. This was necessary not only for Roll's protection but also because otherwise the names of the three persons being investigated by the grand jury would be publicly disclosed.

Before you make any statement I tell you: if it pertains to this presentment before the grand jury on which you were called to testify, the Court again affirms or reaffirms what the State has told you, that you are granted immunity from prosecution in relation to any testimony that you may give concerning this matter of narcotics in relation to the people brought before the grand jury on a presentment.

Do you understand that?

THE RESPONDENT: Not clearly. Would you please repeat that?

THE COURT: Before you testify whatever you want to say at this particular time, you are given the opportunity to show cause why you should not be held in contempt of court. And the Court tells you that in your testimony or statement to the Court, if you should make any statements that may tend to incriminate you in relation to the presentment against the other three people, the Court assures you that you will be promised immunity from prosecution.

Primarily what you are here for is to show cause why you should not be held in direct contempt of court for refusing to testify.

THE RESPONDENT: Well—

THE COURT: I may tell you before you proceed: *prima facie* it appears that you have a great deal to overcome. I do not want to cite you for contempt of court and have to incarcerate you. I will give you an opportunity.

Maybe by this time you would want to go before the grand jury and testify. The proceedings before the grand jury are secret; that is why we cleared everyone from the courtroom.

Now you may make any statement you like."

Roll, who was without counsel regarding his grand jury

appearance, stated that even with immunity he was left in "a very dangerous situation." This was particularly true since, as the State conceded, he would likely be called as a witness at the trial following any indictment returned in this matter. Roll said:

> "That would place both myself and the program that I participate in, in Regional Participation, in a very bad position in what they are trying to do, what I'm trying to do for myself; and not just, you know, fear of being shot in retaliation. Just the fact that I was a juvenile at that time [he was 18 years of age at the time of the hearing] is the only thing that's kept me from being a defendant in that trial."

Roll further testified that though he was without legal representation he understood from non-lawyer friends that he could leave the grand jury room to consult a lawyer on any question asked. He then specifically requested that he be given a hearing after he obtained legal counsel of his own choosing. While the Assistant State's Attorney had no objection to this, it was pointed out that the grand jury was going to be requested to deliberate on the presentment involved that day. Werner also said that the lawyer for RAP told him that he represented Roll, and he had seen them talking together that day. Roll countered by stating that he had talked to the lawyer that day but it was a social conversation and although the attorney had previously represented him, he did not now.

Judge Moorman held Roll to be in "direct contempt of court." Before sentencing he was asked, "Now do you think you want to go before the grand jury, now, this afternoon, and give your testimony?" Roll replied by asking to be incarcerated in the custody of RAP. Instead he was sentenced to and committed to the Montgomery County Detention Center until he purged himself of the contempt by testifying before the grand jury in the matter for which he was called.

The case against Scholl arises from an entirely separate incident from Roll's but it centers around a refusal to testify before the same grand jury on matters concerning the same presentment. At the time Scholl was summoned to appear before the grand jury he was serving a three year sentence at the Maryland Correctional Institution at Hagerstown. Therefore, the State's Attorney obtained a writ of *habeas corpus ad testificandum* so that Scholl could appear to testify. This witness also appeared before the grand jury on October 20, 1971. The transcript of the proceedings before the grand jury discloses that Scholl stated he had counsel with whom he had consulted earlier that day as well as on previous occasions. Scholl admitted that he was aware of the subject matter for which he was summoned to testify but even after the immunity provision of Art. 27, § 298 (c) was read to him, he refused to testify. Although Scholl's attorney was not available at this time to advise him, Scholl specifically denied having a desire to consult with him. When this witness refused to answer any questions, a recess was taken and no further proceedings involving him were conducted by the grand jury on that day.

As with his disposition of the case against Roll, the Assistant State's Attorney promptly submitted a "Petition for Direct Contempt" to the Circuit Court for Montgomery County. It contained, in essence, the same allegations as did the one against Roll; and Scholl was brought before Judge Moorman immediately upon termination of the proceeding concerning Roll. The State presented similar evidence to that presented against Roll. The forelady of the grand jury testified and the transcript of the proceedings before that body was read, and this indicated what we have already summarized. The court inquired of Scholl if he wanted to take the stand and "give any reason why [he] should not be held in contempt of court for failure to testify before the grand jury after [he] had been promised immunity." Scholl requested a postponement so he could confer with

his attorney. The Assistant State's Attorney indicated that he thought the matter was simply a question of whether Scholl would testify. He said that since this witness had extensively consulted with his attorney previously and if he only wanted to consult him again about testifying, no further consultation was needed and, therefore, the State opposed the request for postponement. Judge Moorman observed:

> "This is a direct contempt proceeding. It is in the discretion of the Court whether he grants counsel for you or not. I don't know what counsel could do for you, but he might do something. I doubt it."

He then again explained the grant of immunity. Scholl indicated that he understood but stated:

> "The major reason involved why I refuse to testify against these people is, if I testify against these people then it becomes aware and known to these people. My life will be directly in danger."

The court found him to be "in direct contempt of court" and then imposed sentence. Scholl was initially sentenced to two years imprisonment to run consecutively to the sentence he was already serving, but later the sentence was reduced to a confinement period of 4 months and 16 days also to run consecutively to the sentence he was then serving.[7] However, this sentence was made conditional as it was ordered by the judge that the sentence be suspended if Scholl purged himself of the contempt by testifying before the grand jury on or before March 6, 1972.

Roll and Scholl each appealed from the order of the Circuit Court for Montgomery County which found them

---

7. The sentence of 4 months, 16 days corresponds to the remaining term of the grand jury, but if the trial judge intended that to be a controlling factor he should have changed the consecutive nature of the sentence at the time he reduced it.

in direct contempt to the Court of Special Appeals where the cases were consolidated for hearing. There, they mounted a broadside assault on the immunity provisions of the law and the manner in which the proceedings were conducted. The Court of Special Appeals upheld the constitutionality of Art. 27, § 298 (c) but found improprieties in the proceedings which it concluded required reversal without a new trial for Roll and necessitated a reversal and remand for further proceedings for Scholl. We granted the State's petition for certiorari in both cases.

Here, the constitutionality of the immunity provisions of Art. 27, § 298 (c) is not before us as, even though briefed and argued, appellees have not sought to raise the issue by a cross petition for certiorari. *Walston v. Sun Cab Co., Inc.,* 267 Md. 559, 298 A. 2d 391 (1973). But, we note that if called upon to decide the issue we would not hesitate to affirm the decision of the Court of Special Appeals particularly in light of *Kastigar v. United States,* 408 U. S. 931, 32 L.Ed.2d 212, 92 S. Ct. 1653 (1972) and *Zicarelli v. Investigation Commission,* 404 U. S. 812, 32 L.Ed.2d 234, 92 S. Ct. 1670 (1972), two recent Supreme Court cases [8] decided subsequently to the opinion of the Court of Special Appeals in these cases.

The history of the contempt power is very old with roots stretching back to the early English monarchs and the common law. The power began as a means of assuring the efficiency and dignity of the sovereign, but it soon spread to protect representatives of the king.[9] The contempt power of the courts had a similar origin in

---

8. These cases held that a grant of immunity from "use" and "derivative use" of compelled testimony is constitutional as it is coextensive with the privilege of the Fifth Amendment, while "transactional immunity" is not constitutionally mandated as its protection is far broader than the privilege conferred by the Fifth Amendment. It appears that the grant of immunity here goes beyond "use immunity." Brown v. State, 233 Md. 288, 196 A. 2d 614 (1964).

9. For an extended discussion of the history of contempt *see R. Goldfarb, The Contempt Power,* Ch. I (1963).

that the lord chancellor's authority was derived from the king. But, as the courts became more independent of the crown and their power increased, the authority to punish for contempt was carried with them. In time, it was so established that the power was considered inherent in the courts. *See Ex-Parte Maulsby,* 13 Md. 625, 634 (1859) for an early statement of this rationale in Maryland. *See also Hitzelberger v. State,* 173 Md. 435, 438, 196 A. 288 (1938) ; *Kelly v. Montebello Park Co.,* 141 Md. 194, 118 A. 600 (1922). Through the years the historical foundation of the contempt power has tended to erode and crumble and out of the rubble, confused and indistinct categories have arisen.

Today, contempts are classified as civil or criminal and at least in theory either of these may be direct or constructive. The various categories are not mutually exclusive and in fact the nomenclature assigned to a contempt involves both classes, *e.g.,* a constructive civil, or a direct criminal contempt. Historically, criminal contempts were positive acts which offended the dignity or process of the court. Holding an offending party in contempt of court was designed to vindicate the authority and power of the court and punish disobedience to its orders. The people were considered as the real interested parties to prosecution and the State was generally the prosecutor. *See, e.g., Sheets v. City of Hagerstown,* 204 Md. 113, 102 A. 2d 734 (1954) ; *Kelly v. Montebello Park Co.,* 141 Md. 194, 118 A. 600 (1922). At common law what in Maryland is now regarded as civil contempt probably did not exist; but rather, a process which was employed as a procedure for civil execution was used as a sanction against a party who disobeyed a court order issued for the benefit and advantage of another party in the proceedings.[10] Through the years, civil contempt was substituted for civil execution, and now, in most jurisdictions, civil and criminal contempt are the composite parts of the whole law of contempt, although historically they are derived from a different lineage.

---

10. See *R. Goldfarb, The Contempt Power,* Ch. II (1963).

Today, the line between civil and criminal contempt is frequently hazy and indistinct. Often the same acts or omissions may constitute or at least embrace aspects of both. *Tyler v. Baltimore County,* 256 Md. 64, 259 A. 2d 307 (1969). When this is the case, an alleged contemnor may be answerable in either a civil or criminal contempt proceeding. But, in this State, the distinction between the two types of contempt has been preserved and is important. A civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally remedial in nature and are intended to coerce future compliance. Thus, a penalty in a civil contempt must provide for purging. On the other hand, the penalty imposed in a criminal contempt is punishment for past misconduct which may not necessarily be capable of remedy. Therefore, such a penalty does not require a purging provision but may be purely punitive. In this State, to these factors must be added the degree of proof required to establish a contempt—a civil contempt need be proved only by a preponderance of the evidence, while a criminal contempt must be shown beyond a reasonable doubt. *Winter v. Crowley,* 245 Md. 313, 226 A. 2d 304 (1967) ; *Donner v. Calvert Distillers Corp.,* 196 Md. 475, 77 A. 2d 305 (1950).

The problem of whether to classify a contempt as civil or criminal has plagued the courts of this country on innumerable occasions. The courts of the federal system and of our sister states have provided no ready answer to this dilemma. *See, e.g., Ong Hing v. Thurston,* 101 Ariz. 92, 416 P. 2d 416 (1966) ; *In Re S.L.T.,* 180 So. 2d 374 (Fla. App. 1965) ; *Duemling v. Fort Wayne Community Concerts, Inc.,* 243 Ind. 521, 188 N.E.2d 274 (1963). The United States Supreme Court has groped for a number of years in attempting to find a way of classifying contempts. They seem to have lighted on a gossamer distinction whereby if the act of disobedience consisted solely "in refusing what had been ordered" it is civil,

while if it consisted of "doing what is prohibited" it is criminal. *Shillitani v. United States,* 384 U. S. 364, 16 L.Ed.2d 622, 86 S. Ct. 1531 (1966). Additionally, the Supreme Court based its classification on the nature of the sanction imposed against the contemnor. If the punishment is coercive and the contemnors carry "the keys of their prison in their own pockets" it is civil but if the sanction is to punish it is criminal. *Shillitani v. United States, supra.* These distinctions stem from a number of cases decided by the Supreme Court dating from its germinal case of *Bessette v. W. B. Conkey Co.,* 194 U. S. 324, 48 L. Ed. 997, 24 S. Ct. 665 (1904). *See also, Penfield Co. v. Securities & Exchange Comm'n,* 330 U. S. 585, 91 L. Ed. 1117, 67 S. Ct. 918 (1947) ; *Nye v. United States,* 313 U. S. 33, 85 L. Ed. 1172, 61 S. Ct. 810 (1941) ; *Gompers v. Buck's Stove & R. Co.,* 221 U. S. 418, 55 L. Ed. 797, 31 S. Ct. 492 (1911).

We think that any test which makes the determinative nature of the contempt proceeding dependent upon the sanction imposed at the conclusion of the proceeding is unacceptable. Maryland law does not rely on that basis for its classifications.

In this State, the nature of the proceeding is determined before the time for imposing punishment is reached. While this Court has previously quoted language from Supreme Court cases that have dealt with the problem of categorizing contempts, in *Winter v. Crowley,* 245 Md. 313, 226 A. 2d 304 (1967), Judge Barnes, for this Court, delineated the basic criteria applicable in this State for determining if a proceeding was for civil contempt. The five factors which generally point to a civil contempt are:

> "(1) the complainant is usually a private person as opposed to the State; (2) the contempt proceeding is entitled in the original action and filed as a continuation thereof as opposed to a separate and independent action; (3) holding the defendant in contempt affords relief to a

> private party; (4) the relief requested is primarily for the benefit of the complainant; (5) the acts complained of do not of themselves constitute crimes or conduct by the defendant so wilful or contumelious that the court is impelled to act on its own motion." *Id.* at 317.

This test permits a determination of the nature of the proceeding at the outset. From this, rights, procedural requirements and the manner of the punishment flow. If it is a civil contempt the sanction is coercive and must allow for purging, *McDaniel v. McDaniel,* 256 Md. 684, 262 A. 2d 52 (1970) ; but if it is criminal, it is punitive and must be determinate. However, conditions may be attached to the determinate sentence which provide for an earlier termination.

Situations may arise where at a hearing held pursuant to an order to show cause in what properly began as a civil contempt, facts are presented which indicate that the alleged contemnor cannot comply with the order of the court that directed him to perform an act for the benefit and advantage of another party to the suit. If this inability to comply was caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding should be terminated and new proceedings may be instituted which can result in a finding of criminal contempt. *Cf. Tyler v. Baltimore County,* 256 Md. 64, 71, 259 A. 2d 307 (1969).

This is necessary because once a contempt is determined to be in the nature of a criminal proceeding other rights are necessarily activated. While a contemnor in a criminal contempt proceeding in Maryland is not entitled to indictment by a grand jury and may not have a right to a jury trial,[11] *Sheets v. City of Hagerstown,* 204 Md.

---

11. The right to a jury trial is guaranteed if the offense is serious, *i.e.,* may be punished by an imprisonment of six months or more. Bloom v. Illinois, 391 U. S. 194, 20 L.Ed.2d 522, 88 S. Ct. 1477 (1968).

113, 102 A. 2d 734 (1954), additional criminal safeguards are available to him. The burden of proof is increased, the accused cannot be compelled to testify against himself, he cannot be put in double jeopardy, and, except when a contempt may be dealt with summarily, the panoply of fundamental due process rights comes into play.[12]

We have no difficulty in concluding that if the appellees refused to testify and their refusals were contemptuous, their acts would be criminal contempts. But, that single classification does not permit a complete resolution of the problems presented. We must further fit the contempt into the direct or constructive mold so as to determine what procedures must be adhered to in conducting the proceedings. Subtitle P of the Maryland Rules of Procedure deals with "Contempt." The Rules contained in that section define the terms "direct" and "constructive" contempt and dictate the procedures to be followed in each case. Rule P1 a defines "direct contempt" as one committed in the presence of the court, or so near to the court as to interrupt its proceedings. Rule P3 provides that a direct contempt may be punished summarily by the court against which the contempt was committed. Section b of that rule requires the court to sign a written order that recites the facts constituting the basis for the court's finding and specifying those facts known to the court of its own knowledge and any facts not so known.

Rule P1 b defines "constructive contempt" as one which was not committed in the presence of the court, or so near to the court as to interrupt its proceedings. Constructive contempt proceedings may be instituted by the

---

12. These include not only the right to notice, and the opportunity to be heard but also the right to counsel and with the possibility of imprisonment an indigent has the right to have an attorney appointed for him. Argersinger v. Hamlin, 401 U. S. 908, 32 L.Ed.2d 530, 92 S. Ct. 2006 (1972). *Argersinger* broadens the requirements for assignment of counsel under Maryland Rule 719 b 2 (a), but there must still be compliance with the other mandate of that rule. *See also* the definition of "Serious Crime" in Maryland Code (1957, 1971 Repl. Vol., 1972 Cum. Supp.), Art. 27A, § 2 (h) (2).

court of its own motion, by the State's Attorney, or by any person having actual knowledge of the alleged contempt. Rule P4 a. When an alleged contemnor is proceeded against in this manner, he is entitled to receive service of a show cause order and any other writing or document filed in support of the charge. Rules P4 b 1 (c), and P4 b 2. It is required that the show cause order, issued by the court, shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and the essential facts constituting the contempt charged. Rule P4 b 1 (a), (b). Unless the accused otherwise consents, the judge who issued the citation for constructive contempt is disqualified from presiding at the hearing except where such contempt consists of failure to obey an order or judgment in a civil case. Rule P4 d 2.[13]

Once the initial decision is made as to whether to proceed as a direct or constructive contempt, the procedures to be followed are explicit. However, surmounting that first hurdle may not always be so easy. Here, the trial court, treating these contempts as direct, proceeded to act summarily under Rule P3 a and issued an order in compliance with Rule P3 b. The Court of Special Appeals concluded that this was erroneous. We agree.

The real problem here is to determine what the words "in the presence of the court, or so near to the court as to interrupt its proceedings" as used in Rule P1 a and b mean. In connection with this it must be remembered that direct contempts may be summarily punished. The power to immediately and summarily hold a person in contempt is awesome and abuses of it must be guarded against. *Bloom v. Illinois,* 391 U. S. 194, 202, 20 L.Ed.2d 522, 88 S. Ct. 1477 (1968) and cases cited therein. This is so even though at a summary proceeding an accused

---

13. The P Rules also provide that if the accused answers the show cause order a hearing shall be set, but if he fails to answer within the designated period the case shall be heard *ex parte.* Rule P4 c. Additionally the court may appoint the State's Attorney or any other member of the bar to prosecute. Rule P4 d 1. And, if a person is found in contempt provisions for bond pending appeal are made in Rule P5.

has a right to attempt to exculpate himself. *McMillan v. State,* 258 Md. 147, 153, 265 A. 2d 453 (1970).

The United States Supreme Court has often expressed the opinion that a summary contempt proceeding should be the exceptional case. Such proceedings are only proper in cases where the action of the alleged contemnor poses an open, serious threat to orderly procedure that instant, and summary punishment, as distinguished from due and deliberate procedures, is necessary. In other words, direct contempt procedures are designed to fill the need for immediate vindication of the dignity of the court. *Harris v. United States,* 382 U. S. 162, 15 L. Ed. 240, 86 S. Ct. 352 (1965) ; *Cooke v. United States,* 267 U. S. 517, 69 L. Ed. 767, 45 S. Ct. 390 (1925). As the Supreme Court stated in *Johnson v. Mississippi,* 403 U. S. 212, 29 L.Ed.2d 423, 91 S. Ct. 1778 (1971), "instant action may be necessary where the misbehavior is in the presence of the judge or is known to him, and where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court." But, it is recognized that at times immediate action taken against an attorney guilty of contempt is likely to prejudice his client. If this is the case, it is best to wait until the end of the trial and a more deliberate path followed. *Sacher v. United States,* 343 U. S. 1, 96 L.Ed. 717, 72 S. Ct. 451 (1952). And, while not required, when a judge waits until the end of the trial, it is generally wise to ask a fellow judge to rule on the nature of the conduct of the contemnor if it has in it elements of personal attack upon the judge. The judge must banish personal impulses to reprisal, or to vent his spleen.[14] *Mayberry v.*

---

14. While the courts need not bend over backwards to be lenient to contemnors this rule of caution will reduce chances of excessive punishment or arbitrariness. Of historical interest, we note that we have come far since 1631 in dealing with contemnors. In that year, in France, a convicted felon, aggravated by his sentence, threw a brickbat at the judge which narrowly missed him. For this an indictment was immediately drawn against the prisoner and his right hand was cut off and affixed to the gibbet upon which he was immediately hanged in the presence of the court. Dobbs, *Contempt of Court: A Survey,* 56 *Cornell L. Rev.* 183, 187, n. 9 (1971).

*Pennsylvania,* 400 U. S. 455, 27 L.Ed.2d 532, 91 S. Ct. 499 (1971); *Cooke v. United States, supra.* Of course, the limits of the power to punish for contempt are "the least possible power adequate to the end proposed." *Harris v. United States, supra.*

We think the content and meaning of the phrase "in the presence of the court" as used in Rule P1 a and the procedure sanctioned by Rule P3 for conducting a direct contempt proceeding must be framed against a constitutional background. When this is done, the picture is clear. A direct contempt occurs when the actions of the contemnor interrupt the order of the courtroom and interfere with the conduct of business. When such disruption occurs within the sensory perception of a presiding judge he will have a sufficient knowledge of the contemptuous act which tends to interrupt the proceedings and will not have to rely on other evidence to establish all the details, though some of them can be supplied by additional testimony.

When, as in the case here, the judge does not have personal knowledge of the facts and must learn of them totally from others, direct contempt proceedings are not authorized. The reason such proceedings are not permitted is that there is no need for summarily disposing of an alleged contempt when the behavior of the accused is not personally known to the judge or does not occur so near to the court as to interrupt proceedings then being conducted by the judge. Here, summary proceedings were not immediately necessary to vindicate the court's dignity and the appellees' actions did not imperil any proceedings being conducted in open court.[15] Therefore, we conclude that these two proceedings should have been conducted in accordance with Rule P4 which regulates "constructive contempts."[16] This determination is

15. In fact, it did not even affect the grand jury proceedings for the same day appellees were adjudged to be in contempt, that body, without the benefit of their testimony, returned indictments against the parties under investigation.

16. In Hitzelberger v. State, 173 Md. 435, 196 A. 288 (1938), when confronted by a similar problem in classifying a contempt

consistent with the holdings of the Supreme Court in *Harris v. United States, supra.* In *Harris,* the alleged contemnor was brought before the court for refusing to answer questions propounded before the grand jury. The judge directed him to comply and he still refused. The judge summarily found him in criminal contempt of court. Mr. Justice Douglas, speaking for that Court stated:

> "The real contempt, if such there was, was contempt before the grand jury—the refusal to answer to it when directed by the court. Swearing the witness and repeating the questions before the judge was an effort to have the refusal to testify 'committed in the actual presence of the court' for the purposes of Rule 42 (a).[17] It served no other purpose, for the witness had been adamant and had made his position known. The appearance before the District Court was not a new and different proceeding, unrelated to the other. It was ancillary to the grand jury hearing and designed as an aid to it. Even though we assume arguendo that Rule 42 (a) may at times reach testimonial episodes, nothing

as being either direct or constructive, this Court held that an individual who attempted to discuss with a member of the grand jury, away from the courthouse, ways and means of producing evidence favorable to him in an investigation then being conducted by that body was in constructive rather than direct contempt of court. That case, while noting the existence of Maryland Code (1957, 1966 Repl. Vol.), Art. 26, § 4 which enumerates certain acts that are subject to summary punishment and, therefore, could be construed to be direct contempts, did not decide whether the Legislature had the power to limit, extend, or declare what are contemptuous acts. Likewise, we need not decide that issue here. We note, however, that while Art. 26, § 4 may be declaratory of some acts which may constitute contempts that can be summarily punished, this statute is circumscribed by the definitions and procedures established by the P Rules of the Maryland Rules of Procedure. *Cf.* Weaver v. State, 244 Md. 640, 224 A. 2d 684 (1966). *See also* Hitzelberger v. State, supra; Kelly v. Montebello Park Co., 141 Md. 194, 118 A. 600 (1922).

17. This is a reference to Federal Rules of Criminal Procedure, Rule 42 (a). The comment of the draftsmen of Maryland Rule P3 indicates that the language of sections a and b is largely derived from Federal Rule 42 (a).

in this case indicates that petitioner's refusal was such an open, serious threat to orderly procedure that instant and summary punishment, as distinguished from due and deliberate procedures was necessary." *Harris, supra,* 382 U. S. at 164-65 (citations omitted)..

In sum, we conclude that neither the refusal of Roll nor Scholl to testify before the grand jury constituted a direct contempt of court. Rather, the contempts, if such there were, were constructive criminal contempts and the trial judge utilized the wrong procedures in conducting the hearings.[18] Therefore, both the judgments and sentences of the trial court must be reversed and the cases remanded. If, rather than dismissing these cases, further proceedings are to be pursued against the appellees, they are entitled to have those proceedings conducted in accordance with the procedures governing "constructive contempts" as enumerated by Rule P4. Additionally, they are entitled to all the constitutional safeguards applicable to a defendant in a constructive criminal contempt proceeding as hereinbefore set out in this opinion. If Scholl is later found to be in criminal contempt, the sentence imposed cannot exceed 4 months and 16 days to run consecutively to the sentence he is presently serving,[19] except as permitted under the rule announced in *North Carolina v. Pearce,* 395 U. S. 711, 23 L.Ed.2d 656, 89 S. Ct. 2072 (1969). If Roll is similarly found to be in criminal contempt, he may not be incarcerated for a period greater than 4 months and 16 days less credit for any time already served, subject to the

18. While a cursory reading of State v. Sheridan, 248 Md. 320, 236 A. 2d 18 (1967), might indicate that this Court had previously treated a refusal to fully answer questions propounded by the grand jury as a civil contempt, that is not the case. Sheridan is inapposite to the case here as there the case was not before this Court from an adjudication of contempt but rather from the dismissal of a petition to compel the witness (a news reporter) to fully testify before the grand jury.

19. There can be no doubt that a court can properly sentence a contemnor in a criminal contempt proceeding for a determinate period extending beyond the term of the grand jury. Ex-Parte Maulsby, 13 Md. 625, 642 (1859).

same exception as set forth in *Pearce*. This is so because the judge's sentence of incarceration "until he purges himself of the said contempt by testifying [before] the Grand Jury" was, in effect, a determinate sentence of 4 months and 16 days, the remaining time of the grand jury term.

> *Judgment of the Court of Special Appeals in the case pertaining to Daniel T. Roll modified to provide that the order of the Circuit Court for Montgomery County of 21 October 1971, holding Daniel T. Roll in direct contempt of court and imposing sentence is reversed and the case is remanded to the Court of Special Appeals for further proceedings in accordance with this opinion. Costs in this Court and in the Court of Special Appeals to be paid by the County Council of Montgomery County.*

> *Judgment of the Court of Special Appeals in the case pertaining to William E. Scholl affirmed and the case is remanded to the Court of Special Appeals for further proceedings in accordance with this opinion. Costs in this Court and in the Court of Special Appeals to be paid by the County Council of Montgomery County.*