## WILLIAMS AND FULWOOD v. DIRECTOR, PATUXENT INSTITUTION

[No. 115, September Term, 1974.]

*Decided November 7, 1975.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ., and reargued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

Argued and reargued by *Michael E. Marr*, with whom was *Charles F. Morgan* on the brief, for appellants.

Argued by *Donald R. Stutman, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Clarence W. Sharp, Assistant Attorney General*, on the brief, for appellee. Reargued by *Gilbert Rosenthal, Assistant Attorney General*, for appellee.

SMITH, J., delivered the opinion of the Court. DIGGES, LEVINE and ELDRIDGE, JJ., dissent and ELDRIDGE, J., filed a dissenting opinion in which DIGGES and LEVINE, JJ., concur at page 314 *infra*.

Appellants, Madison Fulwood (Fulwood) and Melvin Williams (Williams), were held in civil contempt of court by a Baltimore City trial judge when they refused to cooperate with the staff of Patuxent Institution in mental examinations to determine whether they were "defective delinquents" within the meaning of Maryland Code (1957) Art. 31B, § 5. In order that we might address ourselves to the propriety of the trial court's action in holding them in contempt we granted the writ of certiorari prior to consideration of the appeals by Williams and Fulwood to the Court of Special Appeals, invoking the provisions of Code (1974) § 12-203 of the Courts and Judicial Proceedings Article. We had previously granted certiorari to consider the

same issue after the decision of the Court of Special Appeals in *Savage v. State,* 19 Md. App. 1, 308 A. 2d 701 (1973), but we dismissed that case as moot prior to argument in this Court when Savage agreed to submit himself to the ordered Patuxent examination. We here reach a conclusion similar to that of the Court of Special Appeals in *Savage* in that we are of the opinion that Williams and Fulwood were properly held in contempt and are not entitled to their liberty.

Fulwood was convicted of arson and assault. Williams was convicted of storehouse breaking with intent to steal goods of the value of $100 or more. In each instance the judge who signed the order referring them to Patuxent was informed by letter that the individuals had precluded the submission of a report within the six-month period specified by § 7 (a) of Art. 31B. Ultimately, written orders were passed on January 21, 1974, requiring each of them — on or before January 25 — to cooperate with the staff and to submit to the series of tests which the institution had long sought to administer. Each order also specified "that any information elicited . . . during the course of . . . examination and evaluation at Patuxent . . . sh[ould] not be used, directly or indirectly, as a basis for subsequent criminal prosecution. . . ." When these men still refused to comply, petitions were filed on January 31, 1974, asking that they be required to show cause why they should not be held in contempt. Orders to that effect were passed on the same day.

The trial court found in each instance after hearing that the January 21 orders requiring Williams and Fulwood to cooperate with the professional staff at Patuxent and to submit to certain testing procedures had been validly issued and that they had willfully disobeyed those orders. As a consequence, each of them was adjudged in contempt on February 20, 1974, and ordered transferred to the custody of the Commissioner of Corrections for confinement until such time as he signified his willingness to obey the January 21 order. The court further ordered that if either of them expressed his willingness to comply, he should be forthwith transferred to Patuxent for a period of 24 hours to be examined by the staff, and then returned to his place of

confinement within the Division of Corrections, subject to further order of court. Accordingly, they were transferred to the House of Correction on March 7, 1974, where both remain at this time. These appeals are from the February 20 orders.

The original sentences of Fulwood and Williams have expired. Thus, they would be entitled to their liberty but for the defective delinquency proceedings. They contend here, as they did in the trial court:

(1) That Art. 31B does not confer jurisdiction upon the courts to compel submission to a personal examination at Patuxent;

(2) That the contempt orders must be vacated because their original sentences have now expired; hence, they are no longer within the class of persons eligible for commitment as defective delinquents;

(3) That if allowance of credit were to have been given for good behavior, the sentences would already have expired when the order requiring submission to the examinations was passed; hence, for this reason, Williams and Fulwood were then no longer within the class of persons eligible for commitment as defective delinquents;

(4) That they were denied procedural due process because they had been confined at Patuxent for an unreasonable length of time — approximately 39 months — without a judicial determination that such confinement was "warranted";

(5) That the orders requiring submission to the examinations, and the resulting punishment for refusal to obey them, violate their Fifth Amendment privilege against self-incrimination.

Some of the contentions and some of the reasoning here may be better understood by reference to a table of events:

> January 15, 1970 — Williams sentenced to term of five years dating from October 16, 1969. On the same date he was ordered examined at Patuxent.
>
> February 5, 1970 — Fulwood sentenced to term of

five years dating from June 13, 1969. On the same date he was ordered examined at Patuxent.

November 11, 1970 — letter forwarded from Patuxent to the trial court to the effect that Williams had refused to cooperate in the diagnostic examination thus precluding a report as to his status as a defective delinquent within six months as required by Code (1957) Art. 31B, § 7 (a). Specific reference was made to our holding in *State v. Musgrove,* 241 Md. 521, 532, 217 A. 2d 247 (1966), that the time provision was directory rather than mandatory in a situation, as Patuxent put it, "where the delay was attributable to the refusal of the inmate to cooperate with the procedures." The court was advised that Patuxent "w[ould] continue to take all allowable steps in Williams' case in order to enable [its staff] to complete the evaluation."

January 19, 1971 — similar letter forwarded to the trial court relative to Fulwood.

June 19, 1972 — decision of the Supreme Court in *McNeil v. Director, Patuxent Institution,* 407 U. S. 245, 92 S. Ct. 2083, 32 L.Ed.2d 719 (1972), holding it to be "a denial of due process to continue to hold [an individual] on the basis of an *ex parte* order committing him for observation." Under the decision in *McNeil* an undiagnosed person would be released when his sentence expired, absent other grounds for detaining him.

July 10, 1972 — Williams and Fulwood applied for the writ of habeas corpus to Judge Plummer Shearin in the Circuit Court for Montgomery County. (They were among the litigants in *Director v. Cash,* 269 Md. 331, 305 A. 2d 833 (1973), *cert. denied,* 414 U. S. 1136 (1974).)

August 14, 1972 — diagnostic staff report was prepared and forwarded to the trial court on Williams which stated, in essence, that, because

of his refusal to cooperate, a diagnostic report as to his status as a defective delinquent could not be prepared.

August 15, 1972 — similar diagnostic staff report as to Fulwood prepared and forwarded.

August 24, 1972 — Fulwood was ordered to show cause on September 29, 1972, why he should not be held in contempt of court for his failure to cooperate with the Patuxent staff and to submit to a personal examination.

September 5, 1972 — a similar order was passed relative to Williams and his hearing scheduled for September 20, 1972.

September 13, 1972 — Williams filed a motion in proper person to dismiss the contempt proceedings.

September 19, 1972 — an Assistant Attorney General addressed a letter to the Criminal Court of Baltimore advising that the pending contempt citations of Williams and Fulwood would be postponed because of the pending litigation in Montgomery County.

October 4, 1972 — Judge Shearin ordered that certain inmates of Patuxent, including Williams and Fulwood, be transferred to the jurisdiction of the Division of Corrections on the ground that the time requirement in Art. 31B, § 7 (a) is mandatory, notwithstanding the recalcitrance of an inmate. This was contrary to the holding of this Court in *Musgrove* that the language of § 7 (a) relative to findings was directory and not mandatory.

October 20, 1972 — Williams and Fulwood were transferred from Patuxent Institution to the Maryland House of Correction in accordance with the opinion and order of Judge Shearin.

December 14, 1972 — Harlan Lee Savage, the litigant in the test case of *Savage v. State*, 19 Md.

App. 1, *supra*, was held in contempt by the Circuit Court for Caroline County for his failure to obey an order of October 3, 1972, requiring him to submit to the examinations at Patuxent. (He was also one of the litigants in *Cash*.)

June 14, 1973 — our opinion in *Cash* was filed reversing Judge Shearin's order of October 4, 1972.

June 28, 1973 — Fulwood was returned from the House of Correction to Patuxent pursuant to our opinion and order in *Cash*.

July 2, 1973 — Williams was returned from the House of Correction to Patuxent Institution for the same reason.

August 20, 1973 — opinion of the Court of Special Appeals filed in *Savage* upholding the circuit court's adjudication of *Savage* as in contempt.

September 18, 1973 — report relative to Fulwood forwarded by Patuxent to trial court indicating lack of cooperation by Fulwood.

November 8, 1973 — similar report relative to Williams was forwarded to the trial court.

January 21, 1974 — hearing in the Criminal Court of Baltimore on the show cause orders relative to contempt previously mentioned. As it is put in the agreed statement of facts, Williams and Fulwood there contended, among other things, "that the original referral orders did not specifically require them to submit to any test, whereupon a written Order of Court was prepared and served upon each Appellant requiring him to submit to and cooperate with certain enumerated examinations on or before January 25, 1974."

January 31, 1974 — orders passed requiring Williams and Fulwood to show cause at a hearing to be held on February 13 why they should not be held in contempt for their refusal to comply by

January 25 with the orders of the trial court that they submit to examination.

February 14, 1974 — hearing held relative to Williams. In the words of the agreed statement of facts:

". . . Williams preliminarily challenged the jurisdiction of the lower court to issue an order directing him to cooperate with the Patuxent Institution staff and submit to a personal examination. Williams contended that the lower court lacked the power to punish him for noncompliance with said order. Evidence was introduced by the State that on January 22 and January 25, 1974, unsuccessful attempts were made to examine Williams. The lower court found as a fact 'that contacts were made on those two days requesting that [Williams] submit to the examinations ordered [on January 21, 1974] and that he continued to refuse to cooperate.'

"Williams pointed to the fact that seventeen (17) months had elapsed between the original date set for the show cause hearing, and the instant hearing, informing the court that the September, 1972 hearing was postponed at the State's request. Williams contended that the commuted expiration date of his five (5) year sentence had expired in the interval time period.

"The February 14 hearing recessed without a ruling on whether the court could exercise jurisdiction in view of the antecedent commuted expiration date.

"On February 20, 1974, Dr. Sigmund H. Manne, Chief Psychologist, Patuxent Institution, was called as a witness on behalf of the State of Maryland. Dr. Manne, using Williams' Patuxent file, testified that nothing in the record would lead him to conclude that Williams was incapable

because of his mental state from cooperating in any of the court ordered tests. . . .

"After Dr. Manne testified, the jurisdictional question was again raised. Williams renewed his contention that his sentence had expired. The State responded that Williams was not entitled to the benefit of a commuted expiration date because he was transferred from Patuxent Institution to the Maryland House of Correction under an order which was later invalidated, and, therefore, he never left the jurisdiction of Patuxent Institution.

"At the conclusion of the hearing, Judge Karwacki ruled that the January 21, 1974 order was validly issued by the lower court with jurisdiction, and found Williams in contempt of court for wilful noncompliance therewith. Judge Karwacki ordered Williams committed to the jurisdiction of the Division of Correction, to be detained thereby until such time as he is willing to comply with the January 21, 1974 Order of Court and submit to a personal examination."

February 20, 1974 — hearing held relative to Fulwood. It is said in the agreed statement of facts:

"He also preliminarily raised the contention that the commuted expiration date of his five (5) year sentence had expired on August 6, 1973. However, the court made no ruling on whether this fact divested it of jurisdiction over the contempt proceedings.

"Dr. Manne also testified in this hearing on behalf of the State. On the basis of Fulwood's Patuxent Institution file, Dr. Manne stated that on January 23 and January 25, 1974, two unsuccessful attempts were made to examine [Fulwood] as ordered. A letter from Harold M. Boslow, Director, Patuxent Institution, to the

lower court, dated January 26, 1974, was read into the record, confirming Fulwood's refusal to be examined. The testimony continued as follows:

(Dr. Manne): On the basis of the file alone I cannot state that the man, Mr. Fulwood, has either emotional instability or anything that would prevent him from cooperating with the examination.

(Mr. Seidel): Is there anything in the file which would indicate to you that his refusal to cooperate in these tests is anything other than wilful?

(Dr. Manne): No, there is nothing in the file that would suggest this to me, from which I could draw that conclusion.

"On cross-examination, Dr. Manne stated that while Fulwood's Patuxent record included reports of prior similar tests and examinations conducted at other state mental hospitals, the results did not refute his conclusion of wilful non-cooperation. . . .

\* \* \*

"At the conclusion of the hearing, Judge Karwacki, basing his action on *Savage v. State, supra,* ruled that the January 21, 1974 order was validly issued by the lower court with jurisdiction, and found Fulwood in contempt of court for wilful noncompliance therewith. Judge Karwacki ordered Fulwood committed to the jurisdiction of the Division of Correction, to be detained thereby, until such time as he is willing to comply with the January 21, 1974 Order of Court and submit to a personal examination."

March 7, 1974 — Williams and Fulwood were transferred to the House of Correction until they purge themselves of their contempt.

July 5, 1974 — Williams and Fulwood filed their

petitions for the writ of certiorari pursuant to Code (1974) § 12-203, Courts and Judicial Proceedings Article, before the Court of Special Appeals rendered a decision in the appeals Williams and Fulwood had entered to that court.

July 26, 1974 — we granted the writ of certiorari.

By way of further background we quote all of footnote 4 and a portion of footnote 5 in the State's brief:

"**4.** Appellant Williams refused to participate in taking a social history on February 18, 1970, and similarly refused to take the Stanford Achievement Test, a school placement test, on June 12, 1970. He refused psychiatric examination on February 27, 1970, March 12, 1970, May 15, 1970, August 24, 1970, January 21, 1971, September 24, 1971, February 17, 1972, and May 25, 1972. He also refused psychological examination on February 19, 1970, May 18, 1970, January 27, 1971, August 24, 1971, and August 10, 1972. Similarly, Appellant Fullwood refused to participate in a social service history, refused a physical examination, refused psychiatric interviews on six occasions and refused psychological interviews on seven occasions prior to 1974 when he again refused to take the psychiatric and psychological tests."

"**5.** . . .

"Appellant Fullwood was found delinquent in 1963 and placed on probation. In 1966 he was convicted of unauthorized use and sentenced to three months in the Baltimore City Jail. In 1970 he committed the current offenses of arson and assault and was sentenced to one year and five years, respectively, the sentences to run concurrently. Appellant Williams was found delinquent in 1952 and placed on probation. In 1953 he was once found delinquent and once ungovernable and placed in Boys Village. In 1955

he was found delinquent and committed to Boys Village, followed in 1956 by a subsequent finding of delinquency and commitment to Boys Village. In 1957, Appellant Williams was convicted of larceny from an auto and sentenced to sixty days in the Baltimore City Jail. In 1958 he was convicted of larceny and sentenced to six months in the Baltimore City Jail, and in that same year was convicted of two counts of robbery and sentenced to three years imprisonment. Subsequently, in 1962 he was convicted of assault and sentenced to one year imprisonment; in 1964 he was convicted of assault and burglary and sentenced to five years imprisonment; in 1966 he was convicted of unauthorized use and sentenced to three months imprisonment; in 1968 another conviction of unauthorized use and deadly weapon which resulted in one year imprisonment; and, finally, the current offense for which he received five years imprisonment."

I

General Background

A defective delinquent is defined in § 5 "as an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment."

Maryland's Defective Delinquent Act came into being in 1951 after extensive and very careful study. Its basic framework was set forth in the report of the Commission to Study Medico-Legal Psychiatry appointed by Governor William Preston Lane, Jr., pursuant to Joint Resolution Number 16 of the 1947 session of the General Assembly of Maryland. The matter was further studied by the

Committee on Medico-Legal Procedure of the Legislative Council of Maryland. *See* Research Report No. 29, submitted December, 1950. The purpose of the proposal, as stated in the first paragraph devoted to that subject on page 2 of the report, was "to confine defective delinquents until, as a result of the special treatment which they need, it is safe to return them to the community." It was pointed out that under the law as it existed at that time "our penal authorities are forced to release some men at the expiration of their sentences, who, there is every reason to believe, will upon their release, because of their defectiveness, constitute a grave menace to the lives or property of innocent Maryland citizens." It was said that "[i]n one sense, the purpose of the proposed law [was] to expand, as a practical matter but not by actual definition, the concept of the area of insanity." Incorporated in the report was information relative to two individuals with whom the Maryland courts had previously been concerned with the comment relative to them that "[t]here is no measurement of the cost and losses to society and to innocent families caused by preventable crimes, such as the James case, the Duker case, and other similar tragedies," and that the recommendations made, "if enacted, would prevent at least some of these crimes in the future without the sacrifice of any basic individual rights."

The Honorable Reuben Oppenheimer, then Chairman of the Board of Correction of Maryland, presented a paper on "Criminal Defectives and the Maryland Law" to the Maryland State Bar Association in 1949.[1] *See* 54 Trans. of Md. St. B. Ass'n. 53 (1949). He made the comment:

> "Medical authorities allege that our criminal law takes too little account of proved achievements of psychology and psychiatry, that our jurisprudence ignores the help which medical science stands ready to give to it." *Id.* at 54.

In light of the constant attack on Patuxent motivated by

---

1. He was president of the Maryland State Bar Association 1955-56, an associate judge of the Supreme Bench of Baltimore City 1955-64, and an associate judge of this Court 1964-67.

dissatisfaction with the fact that there is no set limit on the stay at Patuxent, it is interesting to note that Judge Oppenheimer said:

"It is suggested that under the proposed safeguards, every proper right of the individual would be protected. It may indeed be contended that the proposed legislation would be enacted, in part at least, to help defectives who cannot be helped under the present law. That consideration, however, would not be of material comfort to a person who, as a result of the commission of a comparatively minor offense, may be deprived of his liberty for his lifetime. But such an individual may be found, as a matter of fact, to be as dangerous to the community if released as a wanton murderer. *If that fact is established in a court of law like any other fact, tragic as his plight is, he can have no greater rights as against society than if he had been adjudicated a lunatic." Id.* at 62-63. (Emphasis added.)

It no doubt was as a result of the discussion with Judge Oppenheimer following his address that the provision was written into the law permitting an inmate at Patuxent periodically to have a jury again determine whether he is a defective delinquent, since this was not a part of the original proposal and such right to determination was suggested in that discussion as an additional safeguard.

In *Director v. Daniels,* 243 Md. 16, 221 A. 2d 397 (1966), *cert. denied,* 385 U. S. 940 (1966), this Court adopted the opinion of the Circuit Court for Prince George's County (Digges, C.J. (now a member of this Court) and Powers, J.) which had considered at great length an attack on the defective delinquency statute. A list of the expert witnesses who testified in that case together with their impressive credentials appears as an appendix to their opinion at pages 66-68 of 243 Md. The findings of fact by the trial court in *Daniels* included the statement:

"The advocates of this approach are cognizant of the fact that mental illness suffered by these offenders often is exceedingly difficult of cure, and will usually require confinement for considerable duration in order effectively to complete the treatment process. They recommend the use of an indeterminate sentence to an institution such as described above so that the offender's release will be related to a cure of the illness, and not merely to the passage of time. This concept recognizes, also, that some offenders may never be cured, and hence the indeterminate sentence would accomplish the protection of society but result in their confinement for life." *Id.* at 51.

Statutes having concerns similar to that of the Maryland statute are generally referred to as pertaining to "sexual psychopaths." H. Weihofen, *Mental Disorder as a Criminal Defense* 195-206 (1954). Our research discloses approximately 25 states with such statutes. Many of these statutes are listed by Weihofen, *op. cit.,* 196.

The Maryland statute appears to be unique in the proper use of that much misused word. Unlike the situation prevailing in many states, conviction of a crime, not mere accusation, is a necessary prerequisite to use of our statute. Another point of difference between the Maryland act and others is that in the interest of protecting society the period of confinement under our statute may extend beyond the original prison sentence.

Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 31B, § 6 (a) provides that "request may be made that a person be examined for possible defective delinquency if he has been convicted and sentenced in a court of this State for a crime or offense committed on or after June 1, 1954, coming under one or more of the following categories: (1) a felony; (2) a misdemeanor punishable by imprisonment in the penitentiary; (3) a crime of violence; (4) a sex crime involving: (a) physical force or violence, (b) disparity of age between an adult and a person under eighteen years of age,

or (c) a sexual act of an uncontrolled and/or repetitive nature; (5) two or more convictions for any offenses or crimes punishable by imprisonment, in a criminal court of this State." Such requests under § 6 (b) "may be made by the Department of Correction or by the State's attorney or assistant State's attorney who prosecuted the person for a crime or offense specified . . . in [§ 6 (a)], on any knowledge or suspicion of the presence of defective delinquency in such person. Such person himself, or his attorney in his behalf, may make such a request of the court. Whenever a request for examination comes from any such source the court may order such person to be examined by the institution for defective delinquents to ascertain if he or she is a defective delinquent. The court also may make such an order on its own initiative." By § 6 (c) an examination may be requested "at any time after the person has been convicted and sentenced for a crime or offense specified [in § 6 (a)], provided that the said person has been sentenced to a period of confinement in a penal institution or is then serving such a sentence." A limitation is imposed in that an examination may not "be ordered or made if the said person has been released from confinement for the particular crime or offense of which he was convicted or . . . within six months of the expiration of his sentence." Section 6 (d) provides that a request for an examination "shall be by petition filed with the court having custody of or jurisdiction over the said person . . . ." The court shall then pass a formal written order directed to Patuxent Institution ordering such examination. If "the person to be examined is in the custody of the Department of Correction, such order shall also be directed to [it], which shall forthwith cause the transfer of the person to the custody of Patuxent Institution." Section 6 (e) states that after an examination has been ordered the person "shall be retained in custody, initially of the Department of Correction until his transfer to Patuxent Institution and thereafter in the custody of Patuxent Institution, until such time as the procedures of [Art. 31B, §§ 5-11, inclusive] have been completed, without regard to whether or not the criminal sentence to which he was last

sentenced has expired." That section further provides that, with the exception of certain instances not here pertinent, "[t]he court which last sentenced the defendant, whether or not the term of court in which he was sentenced has expired shall retain jurisdiction of the defendant for the purpose of any of the procedures specified in §§ 6, 7, 8 or 9" of Art. 31B. The examination is to "be made by at least three persons on behalf of the institution for defective delinquents, one of whom shall be a medical physician, one a psychiatrist, and one a psychologist." Under § 7 (a) they are required to "assemble all pertinent information about the person to be examined, before proceeding therewith, including a complete statement of the crime for which he has been sentenced, the circumstances of such crime, the court in which he was sentenced, the nature of the sentence, copies of any probation or other reports which may have been made about him, and reports as to his social, physical, mental, and psychiatric condition and history." On the basis of that information "plus their own personal examination and study of the said person, they [are to] determine whether in their opinion, or in the opinion of a majority of them, the said person is or is not a defective delinquent," stating "their findings in a written report addressed to the court . . . ." If they conclude that he is not a defective delinquent, then § 7 (a) requires that he "be retained in the custody of the Department of Correction under his original sentence as if he had not been examined for possible defective delinquency," with the provision that when returned to the custody of the Department of Correction he must receive full credit for the time he spent at Patuxent Institution. Under § 7 (b) the person so examined is entitled, upon his request, to an examination by a private psychiatrist of his choice at the expense of the State except in the instance where he or his attorney initially requested that he be examined as a defective delinquent.

If the examiners conclude that the individual is a defective delinquent, then § 8 (a) requires that such person be forthwith summoned before the court, advised of the

substance of the report and of the pendency of the hearing provided in § 8 (c), and that he has a "right to be represented at said hearing by counsel of his choice, or if he has no choice, by competent counsel appointed by the court." Provision is made in § 8 (b) for appointment of counsel if an appearance is not made on behalf of such person "within twenty days following the proceedings set forth in subsection (a) . . . ." The time for hearing for the determination of whether an individual is a defective delinquent is set forth in § 8 (c). It is there specified that upon the trial court's own motion or at the request of either the State or the person allegedly defectively delinquent the issues shall be tried before a jury and that "[t]he court shall direct such jury after hearing to find specially, by its verdict, whether the person is a defective delinquent as defined in § 5." If a person is determined by a court or a jury not to be a defective delinquent, then § 9 (a) provides that "the court shall order him returned to the custody of the Department of Correction, and he shall begin or resume his period of confinement on said conviction as if he had not been examined for possible defective delinquency," with provision that when he is so returned he must receive full credit for such time as has been spent by him "in the institution for defective delinquents or within the custody of the Department of Correction . . . ." Section 9 (b) provides:

> "If the court or the jury, as the case may be, shall find and determine that the said defendant is a defective delinquent, the court shall so inform the defendant, and shall order him to be committed or returned to the institution for confinement as a defective delinquent, for an indeterminate period without either maximum or minimum limits. In such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended, and the defendant shall no longer be confined for any portion of said original sentence, except as otherwise provided herein. Instead, the defendant shall thenceforth remain in the custody of the institution for

defective delinquents, subject to the provisions of this article."

A person adjudged a defective delinquent may periodically request further hearing to ascertain whether he is still a defective delinquent. § 10.

The mechanism for release from Patuxent is contained in § 13. By § 12 an institutional board of review is created "consist[ing] of the director, the three associate directors, the professor of the University of Maryland School of Law who is a member of the advisory board, both members of the Maryland bar who are members of the advisory board and a sociologist to be appointed by the board of Patuxent Institution from the faculty of an accredited institution of higher education in Maryland."[2] A quorum consists of "[f]ive members, including either the professor of law or one of the members of the bar who is a member of the advisory board . . . ." Provision is made in § 13 (b) for this board to "review and thoroughly reexamine every person held in custodial care as a defective delinquent, not less frequently than once in every calendar year . . . to determine whether such person shall remain classified as a defective delinquent . . . ." By § 13 (d) if the board of review as a result of its review and reexamination of any person "believes that it may be for his benefit and for the benefit of society to grant him a leave of absence or parole from the institution . . ., it may proceed to arrange for such leave or parole . . . . for a period not to exceed one year." Provision is then made for further review during such period "in order to make further or alternate determination." Conditions may be attached to such release. "The board may at any time revoke a leave or parole, or change the conditions and arrangements therefor." Also, it "may . . . request the court which imposed upon the person the original sentence resulting in his being

---

2. In § 4 (a) creating the advisory board it is provided that its membership shall include "the full-time professor of constitutional law at the University of Maryland School of Law, or if there be no such full-time professor, or if he is unable to serve, such other full-time professor of the University of Maryland School of Law as may be designated by the dean of said school . . . ."

subsequently classified as a defective delinquent, to reinstate the said original sentence; and the said court is authorized and empowered following such a request to reinstate and reimpose the said original sentence, and to cause the said person to be held in custody therefor . . . ." Under § 13 (e) provision is made for leaves of absence "limited to hours during which a person is suitably employed outside the Institution on such terms as are deemed fair and reasonable by the said board." If the board of review concludes that a person "has sufficiently improved to warrant his unconditional release from custody as a defective delinquent, it shall so inform whatever court has jurisdiction over the person." § 13 (f). The court then on the basis of "reports [to it,] study and possible hearing, . . . shall determine whether the person before it shall be released unconditionally from custody as a defective delinquent, released conditionally on a leave of absence or parole, returned to the custody of the Institution as a defective delinquent, or returned to the Department of Correction, to serve the original sentence upon which he was committed prior to being classified as a defective delinquent."

"Maryland's Defective Delinquent Statute — A Progress Report" prepared by Patuxent under date of January 9, 1973, makes interesting reading. In Table 1, appearing at page 3, it reports the national recidivism rate "most frequently quoted for adult offenders" is 65%. It then reports as follows relative to patients during the first ten years of operation of Patuxent:

| | Number | Recidivism Rate |
|---|---|---|
| 1. Patients recommended for commitment but not committed by the Courts (not treated, subjected to regular correctional system programs) | 156 | 81% |
| 2. Patients released at rehearing against staff advice, in-house treatment only | 186 | 46% |
| 3. Patients released at rehearing against staff advice, in-house treat- | | |

|  | Number | Recidivism Rate |
|---|---|---|
| ment plus conditional release experience | 100 | 39% |
| 4. Patients released at recommendation of staff and Institutional Board of Review, in-house and continued treatment for three years on parole | 135 | 7% |

At page 23 the report states that "only 22 (3%) of the first 638 committed patients had not experienced complete or conditional release. Thus, the expressed fear of life confinement as the routine outcome of an indeterminate sentence voiced by certain groups, is not supported by the evidence." The therapeutic milieu employed, called at Patuxent "The Graded Tier System," is described at pages 18 and 19 of the report.

The intent of the statute is to require confinement and treatment of those individuals who have been convicted of crime and who constitute an actual danger to society, a point well illustrated in the discussion for the Court by Chief Judge Brune in *Palmer v. State,* 215 Md. 142, 148-152, 137 A. 2d 119 (1957). It also must be borne in mind, as Judge Henderson put it for the Court in *Eggleston v. State,* 209 Md. 504, 513-515, 121 A. 2d 698 (1956), that "[t]he statutory emphasis is on confinement and treatment of these persons rather than on punishment or deterrence. The statute represents the legislative adoption of concepts that have long been recommended by leading psychiatrists and penologists. See *Guttmacher and Weihofen, Psychiatry and the Law,* pp. 444-446. . . . The detention is not by way of punishment for a crime, but is preventive and therapeutic."

## II

### Fifth Amendment

We first address ourselves to the issue of the Fifth Amendment because if that point were to be decided adversely to the State it would be dispositive of the case.

Williams and Fulwood contend that their Fifth

Amendment privilege against self-incrimination gives them the right to refuse to cooperate in their court ordered Patuxent examinations. The Fifth Amendment to the Constitution of the United States is applicable to the states through the due process clause of the Fourteenth Amendment. *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964). It provides, in pertinent part, that "[n]o person . . . shall be compelled in any *criminal case* to be a witness against himself . . . ." (Emphasis added.) The key phrase is "criminal case." There is no constitutional prohibition against compelling testimony in a civil case so long as the information thus obtained cannot be used in a future criminal case or cannot be used as a lead to other evidence that might be so used. Thus, if compelled information could not be used in a criminal prosecution or used to discover other evidence that might be so used, there is no risk of self-incrimination and the Fifth Amendment privilege is not applicable.

In *Kastigar v. United States,* 406 U. S. 441, 92 S. Ct. 1653, 32 L.Ed.2d 212 (1972), *cited and discussed* in *Maryland St. Bar Ass'n v. Sugarman,* 273 Md. 306, 309-10, 329 A. 2d 1 (1974), the Supreme Court held that the Fifth Amendment did not require "transactional immunity," but only "use and derivative use immunity," which was granted in that instance by statute. In other words, if an individual persists in refusing to disclose requested information after a grant of "use and derivative use immunity," he may be held in contempt and confined as was done in *Kastigar.*

In this case the trial judge provided in his order to cooperate "that any information elicited . . . during the course of . . . examination and evaluation at Patuxent . . . sh[ould] not be used, directly or indirectly, as a basis for subsequent criminal prosecution . . . ." Williams and Fulwood in their brief contend that " [i]n the absence of statutory authority, which does not exist in Maryland, the lower court had no power to grant [Williams and Fulwood] immunity, and therefore the State could not compel [their] testimony over a claim of the Fifth Amendment privilege during an examination at Patuxent Institution." As we see

it, the statute by providing for court ordered examinations and, also, by necessary implication, bestows upon a trial court power to grant a recalcitrant individual "use and derivative use immunity." This is so because to hold otherwise would mean that the order for examination and Rule 420 relative to mental examination, which we shall discuss in part III of this opinion, would be unconstitutional in their application to that portion of a defective delinquency examination which relates to crimes for which an individual has not been prosecuted on which limitations have not run. We have said that where a statute is subject to two constructions, one of which will result in the legality and effectiveness of the statutory provision being construed and the other of which will make it illegal and nugatory, courts will prefer the construction which will result in its legality and effectiveness. *District Land v. Wash. S. S. C.,* 266 Md. 301, 312, 292 A. 2d 695 (1972). We also have held that a statute will be construed so as to avoid a conflict with the Constitution whenever that course is reasonably possible. *Deems v. Western Md. Ry.,* 247 Md. 95, 113, 231 A. 2d 514 (1967). This reasoning would be equally applicable to a rule or order of court. *Cf. Acting Dir., Dep't of F. & P. v. Walker,* 271 Md. 711, 719, 720, 319 A. 2d 806 (1974), relative to the interpretation to be placed upon acts of state officials.

Williams and Fulwood also contend that " [t]he Fifth Amendment privilege also is available to a defendant to guarantee that he does not provide the State with testimony that will be used to commit him to an indeterminate sentence at Patuxent Institution." This contention turns on whether a defective delinquency proceeding is a criminal or a civil proceeding. If it is a criminal case within the ambit of the Fifth Amendment, then the State is constitutionally barred from using any information given under compulsion of the court order because to do so would be requiring these persons to incriminate themselves.

This Court on a number of occasions has answered identical and similar contentions by asserting that defective delinquency proceedings are civil as opposed to criminal. *See e.g. McDonough v. State,* 253 Md. 547, 253 A. 2d 517 (1969);

*Hall v. Director*, 245 Md. 687, 691, 226 A. 2d 669 (1967) (State not required to prove defective delinquency beyond a reasonable doubt and jury not judge of law and fact); *Wood v. Director*, 243 Md. 731, 733, 223 A. 2d 175 (1966) (no privilege against self-incrimination; constitutional right to speedy trial not applicable; double jeopardy not applicable; and no right to counsel during examination); *West v. Director*, 243 Md. 715, 717, 222 A. 2d 639 (1966) (constitutional right to speedy trial not applicable); *Mastromarino v. Director*, 243 Md. 704, 221 A. 2d 910 (1966) (no privilege against self-incrimination; double jeopardy not applicable; and Sixth Amendment right to be confronted with witnesses not applicable); *Dickerson v. Director*, 235 Md. 668, 670, 202 A. 2d 765 (1964) (burden of proof is not beyond a reasonable doubt); *Blann v. Director*, 235 Md. 661, 662, 202 A. 2d 722 (1964), *cert. denied*, 380 U. S. 955 (1965) (no right to counsel during examination); *Williams v. Director*, 232 Md. 632, 192 A. 2d 785 (1963) (no double jeopardy); *Hoverter v. Director*, 231 Md. 608, 609, 188 A. 2d 696 (1963) ("The short answer to the contention that the comment violated a constitutional right against self-incrimination is, again, the fact that this was a civil proceeding."); *Monroe v. Director*, 230 Md. 650, 653, 187 A. 2d 873 (1963) (amendment to statute made subsequent to defendant's confinement did not constitute an *ex post facto* law); *McCloskey v. Director*, 230 Md. 635, 637, 187 A. 2d 833 (1963), *cert. denied*, 374 U. S. 851 (1963) (Sixth Amendment right to speedy trial not applicable); *Herrman v. Director*, 229 Md. 613, 182 A. 2d 351 (1962) (privilege against self-incrimination not applicable; no double jeopardy; and not an *ex post facto* law); *Simmons v. Director*, 227 Md. 661, 663, 177 A. 2d 409 (1962) (no double jeopardy and not a penal statute so not violative of prohibition against *ex post facto* laws); *Meredith v. Director*, 226 Md. 653, 656, 172 A. 2d 501 (1961) ("In *Eggleston v. State*, 209 Md. 504, 121 A. 2d 698, [(1956)], we held that this law was civil, not criminal, in nature and violated no provisions of the State or Federal Constitutions."); *Purks v. State*, 226 Md. 43, 46, 171 A. 2d 726 (1961) ("Thus, while the burden of persuasion is on the State, a fair preponderance of evidence — and not proof beyond a

reasonable doubt — is all that is required to sustain a finding of defective delinquency."); and *Blizzard v. State*, 218 Md. 384, 386, 147 A. 2d 227 (1958) ("We . . . think that it is now quite clear that it is the intention of the General Assembly that such proceedings be regarded as civil in nature as to procedural matters as well [as in substantive matters]."). In *McDonough* Judge Finan quoted for the Court from the opinion of the Court of Special Appeals in *Wise v. Director*, 1 Md. App. 418, 230 A. 2d 692 (1967). In the latter case the Court of Special Appeals said:

"The first two contentions endeavoring to invoke the protection of the *Miranda* decision must be denied for additional reasons. At the outset, it must be observed that the psychological and psychiatric examinations that are performed at Patuxent are not accusatorial stages of a criminal proceeding and do not constitute the type of 'in-custody' interrogation with which the Supreme Court was concerned in *Miranda*. Furthermore, the purpose of the stage of the defective delinquent proceeding that is being attacked herein is not to determine or to gain evidence to prove that the subject has committed a crime, but rather to discover the inmate's mental and emotional condition. Defective delinquency proceedings are civil in nature, *Director v. Daniels*, 243 Md. 16 (1966), and as the applicant's statements did not subject him to criminal liability, there is no constitutional infirmity in the manner in which the examination at Patuxent was conducted, *McCloskey v. Director*, 245 Md. 497. And a person undergoing examination at Patuxent has no absolute right to remain silent. *State v. Musgrove*, 241 Md. 521." *Id.* at 421-22.

Perhaps the most comprehensive discussion of whether a defective delinquency proceeding is a civil proceeding or a criminal proceeding for the purposes of the Fifth and Sixth Amendments is in the opinion of Judges Digges and Powers in the Circuit Court for Prince George's County adopted as

the opinion of the Court in *Director v. Daniels,* 243 Md. 16, 37-43, *supra.* They "conclude[d] that the Maryland Defective Delinquency Act is civil in nature . . . ."

In *Tippett v. State of Maryland,* 436 F. 2d 1153 (4th Cir. 1971), *cert. dismissed as improvidently granted,* 407 U. S. 355 (1972), the court considered numerous constitutional challenges to Maryland's defective delinquency proceedings, including the contention that they violated both the Fifth and Sixth Amendments to the United States Constitution. Chief Judge Haynsworth answered these contentions for the majority of the court as follows:

> "Critical to the appellants' argument is the premise that, without regard to the terminology used, Patuxent is in fact a penal institution, and the proceedings for determination of defective delinquency are equivalent in practice to criminal prosecutions. Almost without exception, their various contentions rest on this foundation. The District Court's rejection of this basic contention, which we affirm, of necessity defeats their arguments. As written by the legislature, construed by the courts, and applied by the staff, the Act selects a medically and legally recognizable class of persons for special treatment. Although criminal conduct is necessarily bound up in every case, the inquiry does not focus on particular criminal acts but on the mental and emotional condition of the person thought to be a member of the statutorily defined class. It is that, and no other factor, which ultimately determines his classification and treatment. In this context, the denomination of the proceedings as civil rather than criminal is not a semantic exercise but a factual description of what occurs. The procedural safeguards erected by the statute are adequate to meet present needs and to protect the petitioners' constitutional rights.
>
> "In sum, the Act represents an enlightened and progressive experiment aimed at rehabilitating

persons whose anti-social activities are occasioned, at least in part, by mental disorders." *Id.* at 1156-57.

Judge Sobeloff, although dissenting in part from that opinion, concurred in the view that the privilege against self-incrimination was not applicable under *In re Gault*, 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967), stating:

"With the continuing reservation that this issue is open to further consideration, I agree, for the present, that the right against self-incrimination cannot be rigidly applied in Patuxent proceeding. I rest, however, not on the asserted ground that the Act is 'civil' but that, because of the unusual nature of the necessary inquiries, the legitimate objectives of the legislation would be frustrated were inmates permitted to refuse cooperation. Granting the inmate the right to silence would in many instances thwart the personal examinations and interviews considered indispensable in determining whether the prisoner is or is not a defective delinquent.[7]

"7. Petitioners' reliance on the Supreme Court's decision in In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) is misplaced for at least two important reasons. The aim of the inquiry in the *Gault* hearings was not to ascertain the mental state of the juvenile, but whether he had committed the specific offense with which he stood charged. Here the inquiry is not intended primarily to prove past criminal conduct, but to assess the inmate's emotional and mental state. Moreover, in *Gault* the Court discounted the state's claim that the juvenile process 'rehabilitated' its clients. By contrast, Patuxent, according to the District Court's finding, does engage in a bona fide treatment program." *Id.* at 1162.

The privilege against self-incrimination has been held inapplicable to proceedings in other states under similar statutes aimed at sexual psychopaths pursuant to the

rationale that these proceedings are "civil" as opposed to "criminal" in nature. *See* Annot., 24 A.L.R.2d 350, 362 (1952), relative to sexual psychopaths and § 4 thereof dealing with constitutional objections to those statutes, and Annot., 34 A.L.R.3d 652 (1970), dealing with sexual psychopaths and rights of accused. In § 14 [a] at page 700 of the latter annotation a number of cases are cited with the statement that in those situations the courts have reasoned "that a sexual psychopathy proceeding is civil in nature, as distinguished from a criminal prosecution, [and the courts in those] cases have sustained the compulsory medical examination of an accused sexual psychopath, as against the contention that it constituted a violation of the constitutional protection against self-incrimination."

Of course, after *Gault* the mere attachment of the label of "civil" to a proceeding does not resolve the question of whether the privilege against self-incrimination is applicable. *See, e.g., Breed v. Jones,* 421 U. S. 519, 95 S. Ct. 1779, 1785-86, 44 L.Ed.2d 346 (1975), and *Matter of Spalding,* 273 Md. 690, 702-05, 332 A. 2d 246 (1975). Courts will look behind the label and ascertain whether the proceeding is essentially a criminal case within the ambit of the Fifth Amendment. As explained by Judge Levine for the Court in *Spalding,* the test to determine whether a proceeding is criminal is two-pronged. He pointed out at 703 that this is made clear by *Gault* and its progeny.

Under this two-pronged test a criminal case within the ambit of the Fifth Amendment is one where the State or Federal government seeks to impose a criminal or quasi-criminal sanction upon an individual for a violation of its law. In other words, a criminal case is one where the pertinent inquiry is into a violation of law and the consequence is a criminal or quasi-criminal sanction. In *Gault* and its progeny juvenile delinquency proceedings, even though labeled "civil," were held to be "criminal" because the inquiry, as put in *Spalding* at 273 Md. 702, was into whether the juvenile committed "an act which would be a crime if done by a person who [was] not a child," and a possible consequence of an affirmative finding was

deprivation of liberty. In essence, the Court held that a juvenile delinquency proceeding was basically a criminal trial provided for children.

A defective delinquency proceeding is not comparable to the provision in some states for a bifurcated trial where the jury first determines guilt or innocence and then, if the defendant is guilty, determines the sentence to be imposed, since under our statute an individual may not even be transferred to Patuxent for examination until after he has been convicted *and* sentenced. Paraphrasing the statement of Judge Oppenheimer to the Maryland State Bar Association, tragic as the plight of a person adjudged a defective delinquent may be, he can have no greater rights as against society than if he had been adjudged a lunatic.

A defective delinquency proceeding cannot be considered a "criminal case" within the ambit of the Fifth Amendment because it is not an inquiry into a violation of any law, but an inquiry into the mental and emotional status of an individual to ascertain whether that individual is a danger to society. Accordingly, a defective delinquency proceeding does not satisfy the first prong of the two-pronged test to determine whether a proceeding is criminal. Therefore, the privilege against self-incrimination is not applicable and persons referred to Patuxent for examination constitutionally may be held in contempt for refusal to comply with an order requiring them to submit to and cooperate with certain enumerated examinations.

### III

Does a court referring a person to Patuxent for examination under Art. 31B have the power to require such person to submit to a psychiatric examination?

In *Austin v. Director*, 245 Md. 206, 225 A. 2d 466 (1967), this Court was faced with the question of whether or not the trial court "had power and authority to grant a new trial at the request of the State after the jury had found and determined that the defendant was not a defective delinquent . . . ." The Court concluded that " [i]f new trials

are to be granted in defective delinquent proceedings, the Legislature, not the Courts, should provide for them." In the process of that opinion Judge Horney said for the Court:

> "While the courts which hear defective delinquency proceedings are courts of general jurisdiction, they become courts of special or limited jurisdiction whenever they proceed to determine (with or without the aid of a jury) the status of persons alleged to be defective delinquents. In such cases, the courts instead of exercising their inherent powers are limited to the power and authority conferred on them by the provisions of Article 31B. A court can be a court of general jurisdiction for some purposes and a court of limited jurisdiction for other purposes. When therefore a court of general jurisdiction proceeds under a special statute it becomes a court of limited jurisdiction for the purpose of such proceeding. See C.J.S., *Courts* § 2. Accordingly, where a court of general jurisdiction undertakes to carry out a special power, a decision made in the exercise of such power is treated as a ruling of a court of limited jurisdiction and the presumption, applicable to a court of general jurisdiction, that it acted within the scope of its jurisdiction does not apply. See 20 Am.Jur.2d, *Courts* § 103." *Id.* at 209.

In *Bullock v. State*, 230 Md. 280, 186 A. 2d 888 (1962), the Court concluded that there was no constitutional or statutory authority for removal. Judge Horney, who wrote for the Court, pointed out that although proceedings relating to defective delinquents are civil in nature, this "does not necessarily mean . . . that such proceedings are 'suits or actions at law' within the purview of the Constitution, the statute or the rule." He said that in *Baltimore v. Libowitz*, 159 Md. 28, 37, 149 A. 449 (1930), the term "suits or actions at law" was held not to include those actions "brought in a court of original jurisdiction by the State in the exercise of its sovereign power or function." The Court held that "the

latter clause would embrace a proceeding such as those brought to determine or redetermine the status of a person as a defective delinquent. Such a proceeding necessarily involves the power and function of the State to safeguard society against the anti-social behavior of a defective delinquent as well as to afford such person a means of terminating his confinement when it becomes apparent that it is reasonably safe to release him from further confinement." Williams and Fulwood take solace from these cases and argue that a trial court is lacking in power to direct compliance with its order for examination at Patuxent. We do not see it that way.

In *Restivo v. Princeton Constr. Co.*, 223 Md. 516, 525, 165 A. 2d 766 (1960), Judge Hammond said for the Court, "That which necessarily is implied in a statute is as much a part of it as that which is expressed," citing Crawford, *Statutory Construction* § 168 (1940), and 3 Sutherland, *Statutory Construction* § 5402 (3d ed. 1943). The same basic statement is found today in 2A Sutherland, *Statutes and Statutory Construction* §§ 55.03 and 55.04 (4th ed. C. Sands 1973). This language was repeated by Judge Hammond for the Court in *Shapiro v. Baltimore*, 230 Md. 199, 210, 186 A. 2d 605 (1962), and by Judge Barnes for the Court in *Chillum-Adelphi v. Board*, 247 Md. 373, 377, 231 A. 2d 60 (1967). As we have already pointed out, Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 31B, § 6 (e) provides that after a court has ordered an examination to be made the person is to be transferred to Patuxent and the court is to "retain jurisdiction of the defendant for the purpose of any of the procedures specified in §§ 6, 7, 8 or 9 [of Art. 31B]. . . ." Section 7 concerns examinations and reports of findings. Section 8 pertains to hearings. Section 9 concerns the prior sentence of a person alleged to be a defective delinquent. The provision relative to retention of jurisdiction was added by the General Assembly. It was not in the original act as proposed by the Legislative Council. The fact that the Court is to retain jurisdiction indicates to us that it would have the power to pass any orders that might be requisite under those sections. We believe it was to make this fact abundantly

clear that this language was used. It would be absurd to say that under the statute a court could send a man to Patuxent for examination and then to say that under the same statute the court is powerless to direct that he cooperate in his very purpose for being at Patuxent. *See e.g. Grosvenor v. Supervisor of Asses.,* 271 Md. 232, 242, 315 A. 2d 758 (1974); *Blocher v. Harlow,* 268 Md. 571, 584, 303 A. 2d 395 (1973); *Coerper v. Comptroller,* 265 Md. 3, 6, 288 A. 2d 187 (1972); and *Pan Am. Sulphur v. State Dep't,* 251 Md. 620, 627, 248 A. 2d 354 (1968), to the effect that we should shun a construction of a statute which will lead to absurd results. In *State v. Musgrove,* 241 Md. 521, 217 A. 2d 247 (1966), Judge Horney said for the Court:

> " [W]e are of the opinion that the order of court referring a person to Patuxent for an examination until such time as the procedures for determining whether or not such person is a defective delinquent have been completed could not be defeated by the refusal of such person to submit to the examination required by § 7 (a) if the Patuxent staff cannot make its determination without it." *Id.* at 532.

Code (1974) § 1-202 of the Courts and Judicial Proceedings Article, applicable to this proceeding since it arose in 1974, provides that " [a] court may exercise the power to punish for contempt of court or to compel compliance with its commands in the manner prescribed by the Maryland Rules . . . ." As far back as *Ex parte Maulsby,* 13 Md. 625 (1859), referred to by some cases in citations to it as "appendix," Judge Bartol, as "one of the judges of the Court of Appeals," had before him an application for the writ of habeas corpus directed to the Sheriff of Frederick County. Referring to Chapter 450 of the Acts of 1853, the antecedent of § 1-202, he said:

> "A contempt is an offense at the common law; it is not created by the Act of 1853, nor is the jurisdiction to punish it conferred by that Act alone. 'It is an offense against the court, as an

organ of public justice. The right of punishing for contempts by summary conviction is inherent in all courts of justice and legislative assemblies, and is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our State Constitution.' Yates' Case, 9 John. 417. The Act of 1853 does not confer upon the courts jurisdiction; it is merely declaratory of what shall constitute a contempt; and while it is intended to restrain the courts from punishing, as a contempt, any thing which does not fall within the terms of the Act, it necessarily devolves upon each court which is called on to enforce it, the power and the duty of construing it. That is the case with every law which the court is called on to construe and administer." *Id.* at 635.

In *Ex parte Sturm*, 152 Md. 114, 136 A. 312, 51 A.L.R. 356 (1927), the Court referred to the statute enacted in 1853 (then Code (1924) Art. 26, § 4) and said:

"The judicial power to punish for contempt did not emanate from the statute just cited. It is a common law power possessed, independently of statute, by our courts of constitutional origin." *Id.* at 120.

Similar statements are found in *Hitzelberger v. State*, 173 Md. 435, 438, 196 A. 288 (1938), and *Kelly v. Montebello Park Co.*, 141 Md. 194, 205, 118 A. 600 (1922). *In re Lee*, 170 Md. 43, 183 A. 560 (1936), *cert. denied*, 298 U. S. 680, arose after enactment of Chapter 357 of the Acts of 1927 which became Code (1924, 1929 Supp.) Art. 5, § 105 providing for an appeal by any person adjudged in contempt with this Court on appeal to "consider and pass upon the law and the facts and [to] make such order as to it m[ight] seem proper, including the right to reverse or modify the order appealed from." Judge Shehan there said for the Court:

"The power and authority possessed by courts may not be destroyed or abridged by legislative enact-

ment. It is recognized as a constitutional attribute, and is preserved as a necessary function of the judiciary. *Rapalje on Contempts*, see 11 (1884 Ed.); *Ex parte Maulsby, supra.*" Id. at 47.

Both *Sturm* and *Lee* were cited with approval and quoted from by Judge Henderson for the Court in *Baltimore Radio Show, Inc. v. State*, 193 Md. 300, 321, 322, 67 A. 2d 497 (1949), *cert. denied*, 338 U. S. 912 (1950). To like effect see *State v. Roll and Scholl*, 267 Md. 714, 727, 298 A. 2d 867 (1973). These statements appear to be in line with holdings elsewhere. *See* annotations on the subject in 8 A.L.R. 1543, 1544, 1553-56 (1920), 54 A.L.R. 318 (1928), and 73 A.L.R. 1185 (1931). Thus, we conclude that it is within the power of a court which orders a person examined at Patuxent to direct such individual to cooperate with the authorities at Patuxent in that examination and to hold him in contempt for failure to cooperate, the power to punish for contempt being inherent in courts of record of constitutional origin, which the trial court was.[3]

## IV

Whether Williams and Fulwood are entitled to an allowance of credit for good behavior which would make their sentences expire prior to the ordered examinations in January, 1974

Williams and Fulwood say that if they were allowed credit for good behavior the commuted expiration date of Williams' sentence would have been October 29, 1973, and the commuted expiration date of Fulwood's sentence would have been August 6, 1973.

The provision in Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 27, § 700 for diminution of period of confinement of a prisoner is applicable to "each prisoner in any of said institutions."[4] The institutions enumerated in Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.) Art. 27, § 689 are

---

3. We have not considered whether Rule 422 b 4 is in any way applicable to this proceeding, a point not presented to the lower court or to us. Rule 885.

4. Language similar to this is found as far back as Chapter 556 of the Acts of 1916 which became Code (1924) Art. 27, § 683. It is interesting in

the Maryland Penitentiary, the Maryland House of Correction, the Maryland Correctional Institution—Hagerstown, the Maryland Correctional Training Center — Hagerstown, the Maryland Correctional Institution for Women —Jessup, the Maryland Correctional Camp Center "located at Jessup," " [s]uch receiving and classification center or centers as may be established by the Department either at one of the institutions enumerated in [§ 689] or elsewhere," and " [a]ny community correction center as established and maintained under the provisions as set forth in § 706 of [Art. 27]." Patuxent Institution is not one of those institutions. In an opinion by Chief Judge Henderson this Court in *Laird v. Director,* 237 Md. 178, 205 A. 2d 238 (1964), held a man properly transferred to Patuxent when the transfer for examination occurred prior to the expiration date of any allowances for earned credits. The point here involved was considered and rejected by this Court in *State v. Musgrove,* 241 Md. 521, *supra.* Judge Horney there said for the Court:

"Finally, *because* a person sentenced on or after the effective date of Chapter 283 of the Laws of 1963, may be detained in Patuxent under § 6 (e) as amended until the procedures for determining whether he is a defective delinquent have been completed regardless of whether or not the criminal sentence has expired *and because* such person is not entitled to credit for good behavior against the criminal sentence unless the conditions specified in § 7 (a) as amended have been met, we are of the opinion that the person so confined should not be released on *habeas corpus* until the court is

this regard to note that in construing Code (1939) Art. 27, § 770 as amended by Chapter 65 of the Acts of 1950, with virtually the same language, the Attorney General held that this provision "d[id] not authorize the reduction of any part of a sentence which is served in a hospital for insane persons, notwithstanding the fact that persons, while undergoing treatment at said hospitals, are guilty of no violations of the rules thereof and that they perform the tasks which are assigned to them." 35 Op. Att'y Gen. 162, 163 (1950).

> satisfied, not only that the delayed delinquency inquiry permitted by § 6 (e) has been completed, but that the credit allowable for good behavior under § 7 (a) has been approved by the Board of Correction." *Id.* at 532-33. (Emphasis in original.)

The "conditions specified in Section 7 (a) as amended," to which Judge Horney referred, are that the examination at Patuxent should have established "that the said person is not a defective delinquent," in which case he would "be retained in the custody of the Department of Correction under his original sentence as if he had not been examined for possible defective delinquency," with provision then that he "be returned to the custody of the Department of Correction with full credit for such time as he has already spent in the institution for defective delinquents or within the custody of the Department of Correction including such allowances (or disallowances) relating to good behavior and/or work performed as the Board of Correction may determine under the provisions of § 688 of Article 27 of the Code." *Musgrove* is dispositive of this contention of appellants. They were cited for contempt and held in contempt before their fixed sentences had expired.

V

Due Process

Appellants argue:

> "Until the decision by the Supreme Court in *McNeil v. Director, Patuxent Institution*, 407 U. S. 245, 92 S. Ct. 2083 (1972), Maryland law had permitted the State to confine a person for examination at Patuxent Institution until such time as the procedures for determining defective delinquency had been completed, without regard to whether the underlying criminal sentence had expired. *State v. Musgrove*, 241 Md. 521 (1966). The Supreme Court held in *McNeil* that such indefinite confinement, without ever obtaining a judicial determination that it was warranted, violated the

Fourteenth Amendment to the United States Constitution. The Court did not set the precise, permissible length of a commitment for examination, but under the facts of *McNeil,* it is established that the outer limit is the expiration of the underlying criminal sentence. *Martin v. Director,* [18 Md. App. 505, 308 A. 2d 212, *cert. denied,* 269 Md. 762 (1973), *cert. denied,* 414 U. S. 1160 (1974)].

"The principles upon which the decision in *McNeil* was based support Appellants' contention that four years of confinement pursuant to an *ex parte* order for examination is unreasonable and violates the Due Process Clause of the Fourteenth Amendment."

We do not see it that way.

McNeil was convicted in 1966 and sentenced to five years' imprisonment. He had not been adjudged a defective delinquent when his case was decided in 1972. As Mr. Justice Marshall put it for the Court:

"His confinement rest[ed] wholly on the order committing him for examination, in preparation for such a commitment hearing. That order was made, not on the basis of an adversary hearing, but on the basis of an *ex parte* judicial determination that there was 'reasonable cause to believe that the Defendant m[ight] be a Defective Delinquent.' " *Id.* at 248.

McNeil contended that the State's power to hold him pursuant to that order had expired. The Court considered and rejected three arguments presented by the State. The first was "that petitioner ha[d] been committed merely for observation, and that a commitment for observation need not be surrounded by the procedural safeguards (such as an adversary hearing) that are appropriate for a final determination of defective delinquency." The Court said that " [w]ere the commitment for observation limited in duration

to a brief period, the argument might have some force." It added, however, that in this instance McNeil had been committed for observation for six years "and on [the State's] theory of his confinement there [was] no reason to believe it likely that he w[ould] ever be released. A confinement which is in fact indeterminate cannot rest on procedures designed to authorize a brief period of observation." It regarded the six month period specified in Art. 31B, § 7 (a) for a report of finding as "a useful benchmark" notwithstanding the fact that "the state courts have apparently construed the statute to permit extensions of time . . . ." In the circumstances of McNeil's case it concluded it to be "a denial of due process to continue to hold him on the basis of an *ex parte* order committing him for observation."

The second argument by the State was that McNeil himself had "prevented the State from holding a hearing on his condition," that "by refusing to talk to the psychiatrists, petitioner ha[d] prevented them from evaluating him, and ha[d] made it impossible for the State to go forward with evidence at a hearing." It was argued that "his continued confinement [was] analogous to civil contempt; he c[ould] terminate the confinement and bring about a hearing at any time by talking to the examining psychiatrists, and the State ha[d] the power to induce his cooperation by confining him." The Court said that "if confinement is to rest on a theory of civil contempt, then due process requires a hearing to determine whether petitioner has in fact behaved in a manner that amounts to contempt," pointing out that " [a]t such a hearing it could be ascertained whether petitioner's conduct [was] willful, or whether it [was] a manifestation of mental illness, for which he c[ould] not fairly be held responsible." Comment was also made that such "a hearing would provide the appropriate forum for resolution of petitioner's Fifth Amendment claim" similar to that made and rejected here. It was held that " [t]he contempt analogy c[ould] not justify the State's failure to provide a hearing of any kind."

The final contention of the State was that McNeil was "probably a defective delinquent, because most non-

cooperators are," thus that "his confinement rest[ed] not only on the purposes of observation, and of penalizing contempt, but also on the underlying purposes of the Defective Delinquency Law." The Court also rejected that contention saying that "if the Patuxent staff [members] w[ere] prepared to conclude, on the basis of [McNeil's] silence and their observations of him over the years, that [McNeil] is a defective delinquent, then it is not true that he has prevented them from evaluating him."

As we have previously observed, Williams and Fulwood were among the petitioners in *Cash.* In that case we found *McNeil* clearly distinguishable from the cases then before us. Judge Barnes observed for the Court at p. 345 of 269 Md. that " [e]ven in regard to persons held at Patuxent whose original criminal sentences had expired, *McNeil* indicates to us that the decision is to be narrowly applied." We also said:

> "We do not consider any of the petitions filed in *Cash* to be within the holding of the Supreme Court in *McNeil* and, further, we do not perceive any holding in *McNeil* that our opinion in *Musgrove* is impaired. Indeed, in *McNeil,* the Supreme Court in Note 2 of its opinion cites *Musgrove* and *Mullen v. Director,* 6 Md. App. 120, 250 A. 2d 281 (1969), applying *Musgrove* for the proposition that the Maryland Courts have construed § 7(a) 'to permit extension of the allowable time . . . in the case of a noncooperative defendant who resists examination.' There was no suggestion that this was unconstitutional or otherwise improper." *Id.* 349 of 269 Md.

Of the procedures followed by Patuxent, we said:

> "After the decision by the Supreme Court in *McNeil* on June 19, 1972, the staff was faced with the problem that an undiagnosed person would be released when his sentence expired. After consultation with the Patuxent Board and with counsel, the staff attempted, where possible, to

diagnose individuals referred for examination who had declined to cooperate in the examination process on the bases of historical data in the file of each individual. Dr. Boslow [, the Director of Patuxent,] further testified, in effect, that he and the staff prefer not to make a diagnosis without a personal interview, but that such a diagnosis would be 'valid' in the absence of a showing of an intentional and deliberate designation on the part of the officials of Patuxent to postpone the diagnosis for an unreasonable time (and there is no such evidence in the present cases). The procedure presently followed by the Patuxent officials is proper in accordance with our opinion in *Musgrove.*"*Id.* at 347.

*Cf. Smith v. Director,* 27 Md. App. 618, 342 A. 2d 334 (1975), and *Weeder v. State,* 274 Md. 626, 337 A. 2d 67 (1975). The latter case held that there must be an independent evaluation of an individual even if he refuses to be interviewed.

*McNeil* is distinguishable. The sentence there had expired. Prior to that decision the practice had been to hold a man at Patuxent indefinitely if he did not cooperate. In *Cash* we reaffirmed our holding in *Musgrove* that the six month provision in Art. 31B, § 7 (a) was directory, not mandatory. After *McNeil* the practice changed, as this case illustrates and *Cash* states. A contempt hearing was scheduled here promptly after *McNeil,* but postponed because these men were pursuing other attacks in their efforts to avoid being adjudged defective delinquents. That litigation consumed a substantial amount of time. The State moved promptly upon its conclusion. It was after the termination of that litigation, but before the expiration of their sentences, that Williams and Fulwood were specifically directed to cooperate in an examination. When they refused to so cooperate, they were held in contempt before the expiration of their sentences. It is under the citation for contempt that they are now held, not under an order similar to that in *McNeil.* Accordingly, we see no denial of due process.

## VI

### Expiration of the original sentences

Unlike the situation in *McNeil,* these men have been adjudged in contempt. Theirs would be a civil contempt. *See State v. Roll and Scholl,* 267 Md. 714, *supra,* where Judge Digges said for the Court:

> "A civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally remedial in nature and are intended to coerce future compliance. Thus, a penalty in a civil contempt must provide for purging. On the other hand, the penalty imposed in a criminal contempt is punishment for past misconduct which may not necessarily be capable of remedy. Therefore, such a penalty does not require a purging provision but may be purely punitive." *Id.* at 728.

The fact that the State is the other party here does not make this other than a civil contempt. If Williams and Fulwood comply with the court's order to submit themselves to examination at Patuxent and if the examiners determine that they are not defective delinquents, then they will be entitled to their freedom since their sentences have expired and the statute provides that they shall be given credit for the time served at Patuxent. Likewise, if they submit to such an examination and the trier of fact, be it judge or jury, concludes that they are not defective delinquents, they will be entitled to their freedom since their fixed sentences have expired. On the other hand, if after trial they are found to be defective delinquents, then for the protection of society they must be held under the provisions of the defective delinquency statute. The choice is theirs as to whether they comply. Persons must not be permitted to flout and defy lawful orders of courts. It is specifically noted that in these cases there was evidence adduced which justified the finding

that the conduct of these men was willful and was not a manifestation of mental illness for which they could not fairly be held responsible.

*Judgments affirmed.*

*Eldridge, J., dissenting:*

The lengthy incarceration of petitioners in this case, now continued beyond their prison sentences and for the indefinite future because they decline to communicate with the psychiatrists and psychologists at the Patuxent Institution, cannot be squared with the Fifth and Fourteenth Amendments to the Constitution of the United States. Compelling petitioners to talk to and furnish test information to the State's psychiatrists and psychologists, where petitioners' responses are to be used in proceedings brought against them to determine whether they shall be deprived of their liberty for potentially life sentences, abridges the Fifth Amendment privilege against self-incrimination. Moreover, confining petitioners for almost four years under the orders referring them to the Patuxent Institution for examination, without any judicial hearings and adjudication that such confinement was justified either on the theory of defective delinquency or on the theory of contempt, violates due process.

(1)

The majority recognizes that forcing petitioners to communicate with the psychiatrists and psychologists may result in their divulging incriminating information that could be used against them, for the majority holds that if the trial court did not under Maryland law have the power to grant petitioners " 'use and derivative use immunity,' " the orders for examinations pursuant to the statute "would be unconstitutional."

Nevertheless, if a grant of immunity is to be a valid basis for an order compelling communications, and for a contempt judgment for refusing to obey the order, the grant must be as broad as the constitutional privilege against self-incrimination. The Supreme Court reiterated this

principle recently in *Kastigar v. United States,* 406 U. S. 441, 449, 92 S. Ct. 1653, 1659, 32 L.Ed.2d 212 (1972):

> "The constitutional inquiry, rooted in logic and history, as well as in the decisions of this Court, is whether the immunity granted . . . is coextensive with the scope of the privilege. If so, petitioners' refusals to answer based on the privilege were unjustified, and the judgments of contempt were proper, for the grant of immunity has removed the dangers against which the privilege protects. . . . If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the privilege, petitioners were justified in refusing to answer, and the judgments of contempt must be vacated."

The grant of immunity by the trial judge in the instant cases was restricted to the use of the information as a basis for *subsequent* criminal prosecution. The orders obviously would not prevent the information from being used against petitioners in the present defective delinquency proceedings. In fact, the entire purpose of the orders here under review was to compel petitioners to divulge information about themselves, to be used in the defective delinquency proceedings, which could lead to indeterminate sentences. Thus, if the privilege against self-incrimination is applicable to the defective delinquency proceedings, the grant of immunity in these cases "is not coextensive with the scope of the Fifth Amendment privilege against compulsory self-incrimination, and therefore is not sufficient to supplant the privilege and compel testimony over a claim of privilege." *Kastigar v. United States, supra,* 406 U. S. at 448.

Today's holding by this Court, that the Fifth Amendment privilege against self-incrimination is not applicable to defective delinquency proceedings, is based on the assertion that defective delinquency proceedings are "civil" and not "criminal." Although relying on statements in earlier opinions of this Court categorizing defective delinquency proceedings as "civil," the majority opinion does

acknowledge that at least since the Supreme Court's decision in *In re Gault*, 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967), merely labeling or categorizing a particular proceeding as "civil" does not govern the applicability of the privilege against self-incrimination. This Court recently stated in *Matter of Spalding*, 273 Md. 690, 703, 332 A. 2d 246 (1975), " [w]hatever else is established by *Gault*, it is clear that labels are not controlling . . . ." Consequently, the several cases in this Court relied on by the majority, all decided prior to *Gault*, stating that various guarantees of the Bill of Rights were not applicable to defective delinquency proceedings because such proceedings were labeled "civil," have little precedential value.

In *Gault*, dealing with juvenile delinquency proceedings, the Supreme Court set forth certain broad principles governing the applicability of the privilege against self-incrimination (387 U. S. at 49, emphasis supplied):

> "It is true that the statement of the privilege in the Fifth Amendment, which is applicable to the States by reason of the Fourteenth Amendment, is that no person 'shall be compelled in any *criminal case* to be a witness against himself.' However, it is also clear that *the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.* The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory."

The Court went on (387 U. S. at 49-50, emphasis supplied):

> "It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement. In the first place, juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would

be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings. Indeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult 'criminals.' In those States juveniles may be placed in or transferred to adult penal institutions after having been found 'delinquent' by a juvenile court. *For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.'* And *our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty* — a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom."

As *Gault* indicates, the central inquiry in determining whether the privilege is applicable is whether the nature of the statement or admission is such that it could lead to a deprivation of liberty.[1] Consequently, the privilege against self-incrimination should attach to any statements made to state psychiatrists and psychologists in connection with defective delinquency proceedings which could lead to an indeterminate deprivation of liberty in the Patuxent Institution. If the possibility of a child's confinement in a

---

1. In Miranda v. Arizona, 384 U. S. 436, 467, 86 S. Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), the Court said that

"there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."

*See also* Haskett v. State, 255 Ind. 206, 210-211, 263 N.E.2d 529, 532 (1970), where the Supreme Court of Indiana held the privilege against self-incrimination applicable to a sexual psychopath proceeding, stating:

"Much more fundamental [in determining whether the privilege applies], however, is the fact that upon determination that a defendant is a criminal sexual psychopathic person, the defendant may be incarcerated in a state psychiatric institution for an indefinite period, possibly for life."

juvenile institution until he reaches the age of twenty-one, based upon his being adjudicated a "delinquent," is sufficient for the availability of the privilege against self-incrimination, then the danger of petitioners' confinement in a maximum security prison for possibly the rest of their lives, based upon their being criminally convicted and then being adjudicated "defective delinquents," is certainly sufficient for the availability of the privilege.

The majority opinion correctly points out that this Court in *Matter of Spalding, supra,* 273 Md. at 703-705, 710, viewed *Gault, In re Winship,* 397 U. S. 358, 359, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970), and *Ivan V. v. City of New York,* 407 U. S. 203, 92 S. Ct. 1951, 32 L.Ed.2d 659 (1972), as establishing a "two-pronged" standard for determining whether juvenile proceedings based on the juvenile's alleged misconduct should be considered the same as adult criminal proceedings with respect to the applicability of certain constitutional safeguards, including the privilege against self-incrimination. The "two-pronged" test was summarized by the Court in *Spalding* as follows (273 Md. at 704-705):

> "In sum, then, Due Process requires that various of the federal constitutional guarantees accompanying ordinary criminal proceedings, specifically including the privilege against self-incrimination, be made applicable at the adjudicatory stage of those juvenile proceedings in which the act charged would constitute a crime if committed by an adult *and* which may result in confinement of the child to a state institution."

The majority in the present case seems to hold that this test is the formula for generally deciding what is a " 'criminal case' within the ambit of the Fifth Amendment." The majority goes on to conclude somehow that a defective delinquency proceeding is not a "criminal case" under this "two-pronged" test.

It is doubtful if the Supreme Court or this Court in

*Spalding* intended that the "two-pronged" test there utilized for determining the availability of certain constitutional safeguards in juvenile proceedings, should constitute a rigid formula for generally deciding whether an individual is entitled to invoke the privilege against self-incrimination.

However, assuming arguendo that the test applied in *Spalding* governs the availability of the privilege against self-incrimination in proceedings under Maryland's defective delinquency law, the result would be no different and the privilege would still be applicable. The "two-pronged" test, as set forth in *Spalding*, is that the privilege is applicable to proceedings "in which the act charged would constitute a crime . . . and which may result in confinement . . . to a state institution." 273 Md. at 704-705. The second "prong" of the test is clearly met here, as an adjudication of "defective delinquency" results in an indefinite sentence to the Patuxent Institution. With regard to the first "prong," a defective delinquency proceeding stems from a person having been charged with a criminal act. If petitioners had not been convicted of criminal acts, there could be no defective delinquency proceedings under Maryland law, and one of the factors which must be established in the proceedings before an individual may be adjudged a "defective delinquent," is that the individual "evidences a propensity toward criminal activity." Maryland Code (1957, 1971 Repl. Vol.), Art. 31B, §§ 5, 8 (c). Thus, contrary to the assertion in the majority opinion, a defective delinquency proceeding does involve "an inquiry into a violation of . . . law."

Whether the privilege against self-incrimination may give a person a right not to communicate with psychiatrists and psychologists in connection with a bona fide *civil* commitment to a *mental hospital* on the ground that he is dangerous to himself or others is not the question presented for decision in this case.[2] A proceeding leading to an

---

**2.** *Cf., e.g.*, People v. Keith, 38 Ill. 2d 405, 231 N.E.2d 387, 390 (1967), suggesting the inapplicability of the privilege under such circumstances.

indeterminate sentence to Patuxent Institution is not a civil commitment proceeding in any realistic sense.[3] Moreover, Patuxent is no mental hospital. It is a maximum security prison under the jurisdiction of the Department of Public Safety and Correctional Services.[4]

A judicial proceeding which could lead to life imprisonment, which is based upon the fact that the defendant has committed a criminal act, and which necessarily involves, *inter alia*, an inquiry into whether he "evidences a propensity toward criminal activity," is in substance a "criminal case" for purposes of the Fifth Amendment privilege against self-incrimination. To hold

---

**3.** The standard for deciding whether a mentally ill person should be involuntarily committed to a mental hospital, namely whether " [f]or the protection of himself or others, [he] needs inpatient medical care or treatment," Maryland Code (1957, 1972 Repl. Vol.), Art. 59, § 12 (a) (2), is not the standard for determining whether one should be committed to Patuxent Institution. As previously pointed out, commitment to Patuxent is based initially upon the fact that one has committed a crime. But for the criminal conviction, there can be no commitment to Patuxent. Of those who have been convicted of crimes, only a defective *delinquent*, defined as one who "evidences a propensity toward criminal activity," is sent to Patuxent. Art. 31B, § 5.

**4.** Code (1957, 1971 Repl. Vol.), Art. 41, § 204A; Code (1957, 1971 Repl. Vol.), Art. 31B, § 1 (a). Also, the governing board of Patuxent Institution is specifically subject to the authority of the Secretary of Public Safety and Correctional Services, and the members of the board are appointed by that Secretary, Art. 31B, § 1 (b). On the other hand, the public mental hospitals in this State are all under the jurisdiction of the Department of Health and Mental Hygiene, with their superintendents appointed by the Secretary of Health and Mental Hygiene. Art. 41, § 206 (e); Art. 59, § 30 (a).

For a description of the Patuxent Institution, *see* Comment 22 Am. Univ. L. Rev. 619, 626, n. 40 (1973), based upon the briefs in McNeil v. Director, Patuxent Institution, 407 U. S. 245, 92 S. Ct. 2083, 32 L.Ed.2d 719 (1972):

> "Maryland's Patuxent Institution, especially created for the treatment of defective delinquents, has been described as having all the attributes of a prison:
>
> > " 'The guards are not specifically trained and have no special qualifications. Tiers are closed off by steel doors. In addition, each cell is sealed by two separate doors — one "a steel grill work door that is always closed except when someone is going in or coming out" and the other a metal, solid door with a window. These cells are nine by six feet in size and have only a bunk, commode, wash basin, table and under drawer table for the bunk. Inmates can shower once a week. Those who engage in infractions are placed in the "hole"; it has only a bunk. Armed guards watch from inside towers inside a barbed wire fence surrounding the grounds.' "

otherwise, in my judgment, makes the availability of the privilege merely depend upon the label attached.

(2)

Wholly apart from the violation of petitioners' rights under the self-incrimination clause of the Fifth Amendment, petitioners' confinement would appear to be inconsistent with the due process principles set forth by the Supreme Court in *McNeil v. Director, Patuxent Institution*, 407 U. S. 245, 92 S. Ct. 2083, 32 L.Ed.2d 719 (1972).

The petitioner in *McNeil* was convicted of two assaults in 1966, was sentenced to five years' imprisonment, and was referred by the sentencing court to Patuxent Institution for examination to determine whether he was a defective delinquent. McNeil refused to communicate with the examiners at Patuxent, and the State, without seeking any further judicial hearing and determination, continued to hold McNeil under the order referring him for examination. The State had not sought any further adjudication concerning McNeil when the Supreme Court decided the case six years later in 1972, after McNeil's original five year sentence had expired. Under these circumstances, the Supreme Court held that the continued confinement of McNeil, without any hearing and adjudication, deprived him of due process of law guaranteed by the Fourteenth Amendment.

With respect to the first four years after the referrals to Patuxent, the facts in the instant case are like those in *McNeil.* On January 15, 1970, and on February 5, 1970, petitioners Williams and Fulwood were ordered to Patuxent Institution for examination. They were received at the Institution on February 16, 1970, and March 6, 1970. It was not until January 21, 1974, that each of the petitioners was ordered to cooperate with the examiners, and it was not until February 14, 1974, and February 20, 1974, that hearings were held and adjudications made holding petitioners in civil contempt for their failure to cooperate.

Petitioners were thus confined for almost four years pursuant to the order directing them to be examined at

Patuxent without any hearing and adjudication that they were either defective delinquents or that they should be held in contempt for their failure to communicate with the psychiatrists and psychologists. During this period there might have been a defective delinquency hearing and adjudication based upon observation of petitioners or other data, a type of examination made at Patuxent which this Court recently sanctioned under appropriate circumstances in *Weeder v. State*, 274 Md. 626, 337 A. 2d 67 (1975),[5] or if under the circumstances a diagnosis was impossible without the petitioners' willingness to communicate with the doctors, the State could have, much sooner than it did, sought hearings and adjudications that petitioners were in contempt. However, the State did neither of these things until almost four years had elapsed.

The majority concludes that *McNeil* is not controlling, and that the lengthy confinement here comports with due process, because in *McNeil* the original criminal sentence had expired without the State taking any steps to seek an adversary hearing, whereas here the State did, although belatedly, take action prior to the expiration of the sentences. While this difference is certainly a major distinguishing factor, I read the *McNeil* opinion somewhat more broadly than does the majority.

The State's initial argument in *McNeil* was that petitioner had been committed "for observation and that a commitment for observation need not be surrounded by the procedural safeguards (such as an adversary hearing) that are appropriate for a final determination of defective delinquency." The Court's response was: "Were the commitment for observation limited in duration for a *brief*

---

5. As we stated in Weeder v. State, 274 Md. at 633:

"It seems to us that the time has come when a clear delineation must be made between an interview and the term 'personal examination and study' used in Art. 31B, § 7 (a). The statutorily mandated examination normally contemplates both an interview and observation. The recalcitrant inmate, who refuses to talk does not necessarily insulate himself from examination, however. He may still be observed and studied, and, in a proper case, a valid diagnosis reached."

*period,* the argument might have some force." *McNeil, supra,* 407 U. S. at 249, emphasis supplied. Mr. Justice Marshall, writing for the Court, later went on (*id.* at 249-250, emphasis supplied):

> "If the commitment is properly regarded *as a short-term confinement* with a limited purpose, as the respondent suggests, then lesser safeguards may be appropriate, but by the same token, the *duration of the confinement must be strictly limited.* ' [D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' [Quoting from *Jackson v. Indiana,* 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972).] Just as that principle limits the permissible length of a commitment on account of incompetence to stand trial, so it also limits the permissible length of a commitment 'for observation.' "

As to the permissible length of the confinement for "examination" at Patuxent before an adversary hearing must be provided, the Supreme Court continued (*id.* at 250):

> "We need not set a precise time limit here; it is noteworthy, however, that the Maryland statute itself limits the observation period to a maximum of six months. While the state courts have apparently construed the statute to permit extensions of time, . . . nevertheless the initial legislative judgment provides a useful benchmark."

Certainly the Court in *McNeil* seemed to be holding that the period of confinement prior to an adversary hearing, under an order referring one to Patuxent for examination, must be relatively short. Although the Court did not set a "precise time limit," it referred to the statutory time limit of six months as "a useful benchmark." It did not refer to the period of the original sentence as the "useful benchmark."

At first glance, there might seem to be merit in the

argument that the State may hold one committed to Patuxent for examination until the expiration of his original criminal sentence without seeking a defective delinquency or contempt hearing and adjudication. Since the State is entitled to deprive the individual of his liberty for the period of his criminal sentence, the argument goes on, it should make no difference that the confinement takes place at the Patuxent Institution instead of at a prison under the jurisdiction of the Division of Correction. It could be contended that the original criminal trial and adjudication furnished the "due process" basis for holding one committed to Patuxent for the period equivalent to his original sentence.

However, the fact that the State may legitimately hold someone in a certain manner for one purpose, for a period of time, does not necessarily mean that the State can for the same period of time confine someone in a totally different manner for a different purpose without any hearing and adjudication related to the purpose for which he is actually being confined. Because of the long confinement at Patuxent without a hearing or adjudication until almost four years had elapsed, petitioners suffered disabilities beyond those associated with the confinement in a regular correctional institution based upon a criminal conviction. As noted by the Supreme Court regarding McNeil, petitioners Williams and Fulwood were for a long time denied an opportunity "to challenge the criteria and procedures that control a defective delinquency hearing," 407 U. S. at 248. Because their confinement was pursuant to an order referring them to Patuxent for examination, petitioners were ineligible for parole consideration, *Herrman v. Director*, 229 Md. 613, 616, 182 A. 2d 351 (1962). Petitioners were also ineligible for various programs which may ameliorate prison confinement, such as the work release programs, compassionate leave, family leave, weekend leave or other special leave, and assignment to minimum security camps. Code (1957, 1971 Repl. Vol.), Art. 27, §§ 700A, 700B, 700C, 700D, 700D-1 and 689 (f).

The most significant disability, perhaps, is that

petitioners were not given the benefit of the statutory good time credits and work time credits to which they would be entitled if confined in a correctional institution based upon their criminal conviction and sentence. Art. 27, § 700. If the normal good time credits were taken into account, then the contempt hearings and adjudications in this case would have occurred *after* the expiration of petitioners' criminal sentences, and *McNeil* would be almost directly in point. As the majority correctly points out, petitioners are not as a matter of State law entitled to the credits because their confinement is under an order referring them to Patuxent for examination. Nevertheless, if the original criminal trial and sentence to the jurisdiction of the Division of Correction is to serve as the "due process" basis for confining petitioners until the contempt adjudication almost four years later, as the majority holds, then the statutory provisions for good time credits which are applicable to that sentence should be considered. Viewed in this light, *McNeil* would clearly require that petitioners be granted their freedom.

The delay of between three and four years before the contempt hearings and adjudications in this case was solely attributable to the State. The petitioners requested no postponements. At any time during this period, the State could have sought adjudications of defective delinquency based upon data other than interviews with petitioners, or the State could have instituted contempt proceedings. When contempt proceedings were finally started, it was the State which sought and was granted postponements. For the State to hold petitioners for almost four years under orders merely referring them to Patuxent for examination, particularly where the Legislature has imposed a six-month time limit with respect to such examinations, is in my judgment a denial of due process.

Judges Digges and Levine authorize me to state that they concur in the views expressed herein.